# IN THE SUPREME COURT OF IOWA

No. 14–1239

Filed April 14, 2017

Amended April 17, 2017

**STATE OF IOWA,**

Appellee,

vs.

**JAMES ALON SHORTER,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Douglas F. Staskal, Judge.

The State seeks further review after the court of appeals reversed the defendant's conviction based on one of three alternative theories of guilt lacking substantial evidence. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

Jennifer J. Bonzer of Johnson & Bonzer, P.L.C., Fort Dodge, for appellant.

Thomas J. Miller, Attorney General, Louis S. Sloven, Assistant Attorney General, John P. Sarcone, County Attorney, and Daniel Voogt and Stephanie Cox, Assistant County Attorneys, for appellee.

**APPEL, Justice.**

Richard Daughenbaugh died after he was assaulted by a group of people on the banks of the Des Moines River in Des Moines. Four people—Kent Tyler, James Shorter, Yarvon Russell, and Leprese Williams—were originally charged with murder in connection with Daughenbaugh's death. Tyler was tried separately from the others and was convicted of second-degree murder for his role in punching Daughenbaugh in the face prior to the group assault which caused Daughenbaugh's death.

In *State v. Tyler*, we held the evidence in Tyler's case did not support the trial court's instruction on joint criminal conduct. 873 N.W.2d 741, 753 (Iowa 2016). Because we could not determine whether the jury convicted him under the tainted instruction or under the legally supported theory that he acted as a principal or aider and abettor, we reversed the conviction and remanded the case to the district court. *Id.* at 753–54.

In this case, as in *Tyler*, a jury convicted Shorter of second-degree murder. On appeal, Shorter claimed that there was insufficient evidence to support the jury's verdict under any of the State's theories. Shorter also claimed that if there was insufficient evidence on the joint criminal conduct theory but sufficient evidence as a principal or aider and abettor, the conviction should be reversed under *Tyler*, 873 N.W.2d 741. Shorter additionally claimed that his counsel provided ineffective assistance by failing to object to the testimony of a witness that identified Shorter when the minutes of testimony did not state that she would make such an identification. Shorter further asserted that once this tainted evidence was admitted, his counsel should have moved for a mistrial. Shorter also claimed that the district court erred when it and

counsel discussed how to respond to questions posed by the jury when Shorter was not present. Finally, Shorter claimed that his trial counsel gave ineffective assistance for failure to request a stock jury instruction on eyewitness identification.

The court of appeals reversed Shorter's conviction. Relying on *Tyler*, the court of appeals concluded that although there was sufficient evidence to support the conviction on the ground that Shorter was a principal in the murder or aided and abetted the murder, there was insufficient evidence to support the joint criminal conduct instruction. *See* 873 N.W.2d at 753.

We granted further review. For the reasons expressed below, we vacate the judgment of the court of appeals and affirm Shorter's conviction.

## I. Factual and Procedural Background.

**A. Evidence at Trial.** The State offered evidence at Shorter's trial which showed that on the evening of August 24, 2013, a group of teenagers and young adults began drinking and partying in a parking lot at the intersection of Second and Center Street near the Wells Fargo Arena and the Des Moines River. Witnesses estimated the size of the group was between thirty to fifty people.

Daughenbaugh arrived at the location and parked in the parking lot. He appeared drunk when he arrived. He approached the group and began participating in drinking and dancing.

A short time after Daughenbaugh arrived, Raymond Shorter, a cousin of the defendant here, testified that Tyler struck Daughenbaugh, declaring, "Don't touch me" or "Don't fucking touch me." Daughenbaugh fell to the ground. At the time of the assault, Monica Perkins was in a parked car in the vicinity. Perkins testified that after Daughenbaugh fell

to the ground, a group assembled around Daughenbaugh and jumped and stomped on his face. Perkins exited her vehicle and attempted to protect Daughenbaugh by lying across his body.

When the group appeared to be about to attack Perkins, her boyfriend, Isaiah Berry, attempted to intervene. He was assaulted by the group and suffered minor injuries. While the group was assaulting Berry, Perkins was able to get off Daughenbaugh's body and call 911. Two young women wrestled the phone from Perkins and threw it toward the river. About two or three minutes after Perkins's 911 phone call, Des Moines police arrived at the scene.

Perkins promptly took the police to Daughenbaugh. He moved slightly but did not answer questions. Paramedics soon arrived and Daughenbaugh was taken to a Des Moines hospital. Daughenbaugh died on the morning of August 25. At trial, the medical examiner testified that Daughenbaugh had multiple blunt force injuries to his head and torso. The medical examiner testified the cause of death was tears to the mesenteric artery—the artery that supplies blood to the large and small intestines—which caused internal bleeding resulting in death.

At trial, the fighting issue was whether Shorter was involved in the assault. The State sought to prove Shorter was one of the participants in the assault that led to Daughenbaugh's death, while the defense, in addition to attacking the State's proof, sought to establish Shorter was in the vicinity but not among the people who gathered around Daughenbaugh.

The State called Perkins to support its case. Perkins was questioned at length about whether she could identify who was involved in the assault on Daughenbaugh. Perkins testified that she remembered identifying one person from an array of photos on the morning of

August 25, but could not provide a description of the person she identified. When asked by the prosecutor if she could now identify the person she picked in the earlier photo lineup, she stated that she did not remember. When pressed by the prosecutor, however, Perkins testified that Shorter was one of the persons she saw stomp on Daughenbaugh. On cross-examination, Perkins admitted that in an earlier deposition, she was unable to identify any of the defendants as having been involved in the assault on Daughenbaugh.

B.B., who was seventeen in 2013, testified she saw Shorter in the crowd that formed around Daughenbaugh. B.B. testified that she left when the crowd formed. B.B. further testified Shorter contacted her shortly after the night of the murder and asked B.B. to tell the police that Shorter had been with B.B. at a pedestrian bridge some distance away from the site of the assault on Daughenbaugh. On cross-examination, B.B. admitted that she had given inconsistent answers in an earlier deposition and that she had been drinking vodka continuously for about three or four hours prior to the murder.

L.S., who was fifteen at the time of the murder, testified she saw Shorter kick Daughenbaugh. She testified that after the assault on Daughenbaugh began, she left the scene. Like B.B., L.S. too had been drinking on the evening of the assault and was impeached by the defense regarding inconsistent statements she made to the police and in a prior deposition.

T.T., another minor witness, claimed at trial to not remember many of the events on the night of the murder. She did, however, testify Shorter was not involved in the assault on Daughenbaugh.

Detective Timothy Peak testified as a rebuttal witness for the State. Peak testified that after police arrived at the scene, Shorter told him that

he had gone up to Daughenbaugh and kicked him while he was on the ground to check to see if Daughenbaugh was okay.

The defense offered evidence that Shorter was not a participant in the assault. Berry testified that he knew Shorter and that Shorter was not in the crowd surrounding Daughenbaugh. Berry further testified that he was positive that Shorter was not one of the people who assaulted Berry after his girlfriend had tried to intervene on Daughenbaugh's behalf.

Raymond Shorter also testified at trial. He stated Shorter was near the pedestrian bridge at the time the assault began and was not involved in it. Similarly, Jontay Williams testified that Shorter was not involved and that when the assault broke out, he was talking to a girl down the hill near the water. Williams testified that when the fight broke out, he called for Shorter and Russell and they immediately left in his car. Finally, Nakeba Blair—a friend of Shorter and Russell—testified they were not involved in the fight.

**B. Jury Instructions and Verdict.** The district court instructed the jury on first- and second-degree murder. On second-degree murder, the jury was instructed that the defendant could be found guilty if the jury found "the defendant, individually or through joint criminal conduct or through aiding and abetting another, assaulted Richard Daughenbaugh," Daughenbaugh died as a result of the assault, and "[t]he defendant, individually or through joint criminal conduct or someone he aided and abetted, acted with malice aforethought."

On joint criminal conduct, the jury was instructed that "[w]hen two or more persons act together and knowingly commit a crime, each is responsible for the other's acts done in furtherance of the commission of the crime." Among the elements that the State had to prove in the case

to show joint criminal conduct, the State had to show that "[w]hile furthering the crime of assault, the other person or persons committed the different crime of murder."

The jury returned a general verdict finding Shorter guilty of second-degree murder. The district court denied Shorter's motion for a new trial and entered judgment. Shorter appealed.

**C. Issues Presented.** On appeal, Shorter claims the evidence at trial was insufficient to support his conviction as a principal, an aider and abettor, or under a joint criminal conduct theory and the submission of these theories to the jury was erroneous. Shorter also claims trial counsel provided ineffective assistance for failing to object and request a mistrial when Perkins testified that she saw Shorter stomping on Daughenbaugh when the minutes of testimony did not state that Perkins would make an identification. Shorter further claims he is entitled to a new trial because the district court and counsel discussed how to respond to questions posed by the jury when Shorter was not present. Finally, Shorter asserts his trial counsel gave ineffective assistance by failing to request a stock jury instruction on eyewitness identification.

**II. Challenge to Verdict Based on Sufficiency of the Evidence.**

**A. Standard of Review.** Challenges to sufficiency of the evidence are reviewed for correction of errors at law. *State v. Hearn,* 797 N.W.2d 577, 579 (Iowa 2011). We will affirm a trial court's denial of a motion for judgment of acquittal if the record contains substantial evidence supporting the defendant's conviction. *State v. McCullah,* 787 N.W.2d 90, 93 (Iowa 2010).

On a motion for a new trial, the district court uses a weight-of-the-evidence test. *State v. Nitcher,* 720 N.W.2d 547, 559 (Iowa 2006); *State v. Reeves,* 670 N.W.2d 199, 202 (Iowa 2003). This test is more searching

than the sufficiency-of-the-evidence test, involves questions of credibility, and requires the district court to determine whether more credible evidence supports one side or the other. *State v. Ary*, 877 N.W.2d 686, 706 (Iowa 2016); *Nitcher*, 720 N.W.2d at 559. We have cautioned trial courts, however, "to exercise this discretion carefully and sparingly" because of the deference owed to the jury's credibility determinations. *State v. Ellis*, 578 N.W.2d 655, 659 (Iowa 1998). We review the trial court's ruling on a motion for a new trial for abuse of discretion. *Nitcher*, 720 N.W.2d at 559; *Reeves*, 670 N.W.2d at 202.

**B. Positions of the Parties.**

1. *Sufficiency of the evidence as principal.* Shorter first challenges the sufficiency of the evidence as a principal. Shorter begins by attacking the eyewitness testimony of Perkins and L.S. He directs our attention to *State v. Henderson*, 27 A.3d 872 (N.J. 2011). In *Henderson*, the New Jersey Supreme Court canvassed the evolving scientific literature related to eyewitness testimony that raised questions about its reliability. *Id.* at 896–910. Because of the reliability issues, the New Jersey Supreme Court imposed limitations on the admission of eyewitness testimony in New Jersey courts under the due process clause of the New Jersey Constitution. *Id.* at 928.

Turning to the facts of this case, Shorter notes that Perkins was unable to identify Shorter as one of the attackers at her pretrial deposition. With respect to L.S., Shorter emphasizes that she admitted she had been drinking vodka for three or four hours and was very intoxicated at the time of the attack. In contrast, Shorter notes that Berry, Raymond Shorter, Blair, and T.T. all testified that Shorter was not involved in the assault on Daughenbaugh.

Further, Shorter asserts there is no evidence that he directly contributed to the death of Daughenbaugh. Shorter notes that the coroner testified that Daughenbaugh died as a result of internal bleeding to the abdominal cavity caused by tears to the mesentery. Shorter, however, points out that Perkins testified Shorter stomped on Daughenbaugh's head. The coroner testified that Daughenbaugh suffered head injuries before the abdominal injuries and that the injuries to the head did not directly contribute to Daughenbaugh's death. There is no evidence, according to Shorter, that he kicked Daughenbaugh in the *abdomen.* After Daughenbaugh fell to the ground, about fifteen people started to kick and stomp him. There was no evidence, however, that Shorter's kick incapacitated him or led to his death.

The State counters that under Iowa Code section 703.1 (2013), "All persons concerned in the commission of a public offense, whether they directly commit the act constituting the offense or aid and abet its commission, shall be charged, tried and punished as principals." Thus, according to the State, there is no difference between liability as a principal and liability as an aider or abettor. *See State v. Black*, 282 N.W.2d 733, 735 (Iowa 1979).

On the question of causation, the State asserts the convictions may be sustained on a theory of aggregate causation. In support of its argument, the State cites *Paroline v. United States*, 572 U.S. ___, 134 S. Ct. 1710 (2014). In *Paroline,* the Supreme Court noted "it would be anomalous to turn away a person harmed by the combined acts of many wrongdoers simply because none of those wrongdoers alone caused the harm." *Id.* at ___, 134 S. Ct. at 1724. Thus, according to the State, if the evidence is sufficient to show that Shorter took part in the assault, the State does not have to prove which kick delivered the fatal blow.

With respect to identity, the State agrees that it has the burden of establishing that Shorter participated in the assault. The State notes that Perkins identified Shorter as an assailant in a pretrial photo lineup as well as at trial. Further, Shorter's attempt to persuade B.B. to concoct a story establishing an alibi and his admission to Detective Peak that he kicked Daughenbaugh, if only to see if he was okay, provided substantial evidence that Shorter was a participant in the assault. The fact that Shorter admitted to Detective Peak that he was in the assault area contradicted the testimony of other witnesses who claimed that Shorter was not in the area.

2. *Sufficiency of the evidence on aiding and abetting.* On the alternative theory of aiding and abetting, Shorter emphasizes that mere nearness to, or presence, at the scene of the crime, without more, is not aiding and abetting. *See State v. Allen,* 633 N.W.2d 752, 754–55 (Iowa 2001). Shorter argues that there is simply no evidence that he advised or encouraged anyone to assault Daughenbaugh or cheered the attackers on. Shorter claims he was merely present at the scene and that is insufficient to support a second-degree murder conviction on an aiding and abetting theory.

The State responds that the evidence goes well beyond establishing Shorter's mere presence at the crime scene. Perkins and L.S. testified that Shorter participated in kicking Daughenbaugh. A reasonable jury could believe that Shorter's telling police that he kicked Daughenbaugh "to see if he was okay" was simply an effort to deflect culpability for the crime and was absurd on its face. Once the State established that Shorter participated in the assault, the elements of aiding and abetting were established.

3. *Sufficiency of the evidence on joint criminal conduct.* On the theory of joint criminal conduct, Shorter asserts there was no showing that he was acting in concert with others to cause the death of Daughenbaugh. Further, Shorter asserts there were not two crimes—instead, everyone was assaulting Daughenbaugh at the same time. As a result, Shorter argues the submission of the joint criminal conduct instruction was erroneous.

Shorter asserts the case is similar to *State v. Smith*, 739 N.W.2d 289 (Iowa 2007). In *Smith*, we emphasized the need for two separate crimes to support a joint criminal conduct instruction. *Id.* at 294. The defendant must act in concert with another for the first crime, and a different crime must then be committed by another participant in furtherance of the original offense. *Id.*

The State asserts that joint criminal conduct does not require an explicit agreement, but only that the participants acted together. Further, the State suggests each kick or stomp inflicted on Daughenbaugh constitutes a separate assault. *See State v. Hohle*, 510 N.W.2d 847, 849 (Iowa 1994). The State argues that there were, in fact, two crimes—the crime of assault and the crime of murder. According to the State, the fact that Daughenbaugh's death was reasonably foreseeable from the group assault is sufficient to satisfy the legal requirement that the murder be "in furtherance" of the conspiracy. *See State v. Satern*, 516 N.W.2d 839, 844 (Iowa 1994).

4. *Impact of unsupported instruction on general verdict.* Shorter asserts that if any one of the theories of conduct fail, the remedy is a remand of the case for a new trial. *See State v. Hogrefe*, 557 N.W.2d 871, 881 (Iowa 1996). Shorter points out that when a general verdict is returned, it is impossible to tell whether the jury based its verdict on a

legally supported theory or upon a flawed theory. *State v. Heemstra*, 721 N.W.2d 549, 558–59 (Iowa 2006).

The State responds by noting that to the extent the evidence did not support a joint criminal conduct instruction, there is no reversible error. The State recognizes the defendant's argument that "if any one of the theories of conduct fail, the remedy is to remand the case for a new trial." But, the State suggests, the argument is only partially correct. According to the State, reversal for an erroneous submission of a joint criminal conduct instruction is not required unless there is an opportunity for the jury to find the defendant guilty based on anything other than the defendant's own conduct as a principal or aider and abettor of the crime charged. *State v. Jackson*, 587 N.W.2d 764, 766 (Iowa 1998). In other words, if the verdict must have been based upon a finding that Shorter was either acting as a principal or aider and abettor, then the erroneous submission of the joint criminal conduct instruction does not require reversal. *See id.*

### C. Discussion.

1. *Sufficiency of the evidence as a principal.* With respect to Shorter's attack on the sufficiency of the evidence for principal liability based on causation, we begin by noting that B.B. testified Shorter was part of the group forming around Daughenbaugh at the beginning of the assault. The evidence showed that once Daughenbaugh fell to the ground, the assembled group, yelling and jeering, proceeded to stomp on Daughenbaugh. L.S. testified that she saw Shorter kicking Daughenbaugh as part of the assault and that she left the scene thereafter. Perkins also testified she saw Shorter kick Daughenbaugh as part of the group assault. Shorter himself admitted to Detective Peak that he kicked Daughenbaugh "to see if he was okay," thus establishing

that he was at the scene of the crime and not elsewhere as testified by defense witnesses. And, Shorter asked B.B. to concoct an alibi for him shortly after the murder, implying guilt.

There is thus substantial evidence in the record that Shorter was present and that he did more than simply kick Daughenbaugh *after* his death. There is substantial evidence that Shorter was one of Daughenbaugh's attackers prior to his death as part of a group assault.

In *Tyler*, we considered whether the evidence in that case supported liability on a principal theory. 873 N.W.2d at 747. We noted while there was substantial evidence that Tyler punched Daughenbaugh in the face, knocking him to the ground, the autopsy revealed Daughenbaugh's death was not caused by blows to the head, but by tears to the mesentery caused by blows to the abdomen. *Id.* at 745, 747. The state maintained that the jury was entitled to infer that Tyler remained at the scene and participated in the subsequent kicking and stomping. *Id.* at 747.

Although we accepted the state's alternative causation argument, we rejected the state's argument based upon the state's assertion that Tyler participated in the kicking and stomping. *Id.* We emphasized in *Tyler* that "[n]o witness testified that Tyler . . . was one of the persons kicking or stomping *on Daughenbaugh's abdomen.*" *Id.* (emphasis added). We noted that the evidence showed there were a significant number of persons in the group surrounding Daughenbaugh and "to draw the inference that Tyler delivered one of the fatal blows requires guesswork and speculation." *Id.* It could be argued that under *Tyler*, allowing a jury to draw the inference that Shorter delivered one of the fatal blows to the abdomen requires guesswork and speculation.

Unlike in *Tyler,* however, in this case there is substantial evidence that Shorter participated in the kicking and stomping when Daughenbaugh was on the ground. It would be a misreading of *Tyler* to require the State to present direct evidence that Shorter delivered a kick to the abdomen which caused Daughenbaugh's death in order to support a second-degree murder conviction as a principal. Although not all blows delivered to Daughenbaugh were a cause of his death, this case involves an aggregate group assault in which the State showing who delivered which blow to a specific body part is not required. *See People v. Bailey*, 549 N.W.2d 325, 334 (Mich. 1996) (stating in group assault context that "it is not necessary that the party convicted of a crime be the sole cause of that harm, only that he be a contributory cause that was a substantial factor in producing the harm"); *Umoja v. State*, 965 S.W.2d 3, 9 (Tex. Ct. App. 1997) (per curiam) (holding, in context of a group assault resulting in death of a homeless man, defendant's conduct combined with others together may be sufficient unless conduct of defendant clearly insufficient), *aff'd on reh'g*; *accord State v. Texieira*, 944 A.2d 132, 142 (R.I. 2008).

In *Tyler,* we concluded that there was sufficient causation ground on an alternate theory of liability, namely, that Tyler's actions were sufficient to support liability as a principal because it was a factual cause of foreseeable subsequent harm. 873 N.W.2d at 748. Under a similar theory, it is sufficient to show that Shorter participated in a vicious group assault of a victim on the ground. A foreseeable result of participating in the group kicking and stomping of a helpless person is that the victim may receive blows to the body that cause death. *See id.* at 749. Such causation is not so attenuated as to prevent imposition of criminal liability. *See State v. Garcia,* 616 N.W.2d 594, 597 (Iowa 2000).

Shorter also challenges the strength of the State's identity evidence. While Shorter cites the New Jersey case of *Henderson*, no state constitutional challenge is raised here regarding the evidence offered in this case. *See* 27 A.3d at 915–18. The sole issue on appeal is whether the State offered substantial evidence to support the identification of Shorter as a participant in the crime.

On the record before us, we conclude that the State has met its burden of producing substantial evidence that Shorter participated in the assault. While Shorter was able to impeach Perkins, B.B., and L.S., the strength of the identity evidence of these witnesses is a question for the jury. *See State v. Jordan,* 409 N.W.2d 184, 186 (Iowa 1987) ("[Q]uestions of witness credibility[] are of course matters reserved for jury determination."). While it is true that Shorter offered testimony from several witnesses that he was not at the scene, a jury was free to credit the testimony of Detective Peak, who testified that Shorter told him that he had kicked Daughenbaugh while he lay prostrate, thereby demonstrating his presence at the scene of the crime.

2. *Substantial evidence as aider and abettor.* We considered the sufficiency of the evidence on a theory of aiding and abetting in *Tyler,* 873 N.W.2d at 750. In *Tyler,* we held there was sufficient evidence to support the aiding and abetting theory. *Id.* at 751–52. We noted that Tyler's striking Daughenbaugh while a crowd formed was sufficient to support a finding of encouragement of subsequent acts. *Id.* at 750–51. We further noted that a jury could conclude that Tyler did not walk away but remained with the crowd while Daughenbaugh was brutally beaten. *Id.* at 751.

> To sustain a conviction on the theory of aiding and abetting, the record must contain substantial evidence the accused assented to or lent countenance and approval to the criminal

act either by active participation or by some manner encouraging it prior to or at the time of its commission.

*State v. Spates*, 779 N.W.2d 770, 780 (Iowa 2010) (quoting *State v. Tangie*, 616 N.W.2d 564, 574 (Iowa 2000)).

Here, the evidence of aiding and abetting is even stronger than in *Tyler*. The State's evidence was that Shorter was present at the beginning of the beating and participated in the subsequent kicking and stomping of Daughenbaugh. Such evidence is plainly sufficient to support an aiding and abetting theory. *See Spates*, 779 N.W.2d at 780, *Tangie*, 616 N.W.2d at 574.

3. *Substantial evidence to support joint criminal conduct instruction.* In *Tyler*, we considered the question of whether the evidence supported a joint criminal conduct instruction. 873 N.W.2d at 752. In *Tyler*, unlike here, the evidence only showed that the defendant had initially punched Daughenbaugh in the face, causing him to fall to the ground, but did not establish Tyler acted in concert with others or participated in the subsequent group assault. *Id.* On the facts of *Tyler*, we concluded that there was insufficient evidence to support an instruction based upon joint criminal conduct. *Id.* at 753. We further concluded that the error required reversal of Tyler's conviction. *Id.* at 754.

Although the fact pattern is different in this case, we conclude that the teaching of *Tyler* with respect to the sufficiency of the evidence to support a joint criminal conduct instruction is fully applicable here. In *Tyler*, we emphasized that joint criminal conduct requires two acts—namely, a crime in which the joint actor knowingly participated and a subsequent crime that is unplanned but reasonably foreseeable in furtherance of the first crime. *Id.* at 752; *see also State v. Rodriguez*, 804 N.W.2d 844, 852 (Iowa 2011); *Satern*, 516 N.W.2d at 843. The first or

predicate crime in joint criminal conduct must be conducted in concert with another. *Tyler*, 873 N.W.2d at 752. The second crime under joint criminal conduct must then be in furtherance of the first crime. *Id.*

Here, it might be arguable that Tyler's initial assault was a separate crime from the group assault. But there is no substantial evidence that Shorter acted in concert with Tyler when Tyler first struck Daughenbaugh. Shorter contends that the subsequent group beating, although it involved multiple assailants, cannot be regarded as multiple crimes under our unit of prosecution cases. *See, e.g., State v. Love*, 858 N.W.2d 721, 724 (Iowa 2015); *State v. Ross*, 845 N.W.2d 692, 704–05 (Iowa 2014); *State v. Velez*, 829 N.W.2d 572, 579–84 (Iowa 2013). We need not decide the issue, however, because, as explained below, even if the joint criminal conduct instruction was erroneously given, reversal is not required under the facts of this case.

We begin our analysis of the impact of the joint criminal conduct instruction with discussion of *Tyler*. In *Tyler*, we held that in the context of that case, the submission of the faulty instruction required reversal. 873 N.W.2d at 754. We noted that the general rule in Iowa—contrary to that announced by the United States Supreme Court in *Griffin v. United States*, 502 U.S. 46, 60, 112 S. Ct. 466, 474 (1991)—has been where one theory of liability is flawed because of insubstantial evidence to support it in a multitheory case because of insubstantial evidence, a general verdict must be reversed because we have no way of determining which theory the jury accepted. *Tyler*, 873 N.W.2d at 754; *see, e.g., State v. Lathrop*, 781 N.W.2d 288, 297 (Iowa 2010); *Heemstra,* 721 N.W.2d at 558–59; *State v. Tejeda*, 677 N.W.2d 744, 754–55 (Iowa 2004); *Hogrefe*, 557 N.W.2d at 881; *State v. Pilcher*, 242 N.W.2d 348, 354–56 (Iowa 1976); *State v. Mays*, 204 N.W.2d 862, 865 (Iowa 1973).

In these cases, we have emphasized that reversal is required because there was no way in which we could determine whether the jury's verdict was based upon the flawed jury instruction. *See State v. Thorndike*, 860 N.W.2d 316, 321 (Iowa 2015). In *Tyler*, we reaffirmed our well-established approach and required a retrial when a flawed submission of a joint criminal conduct instruction may have tainted the jury verdict. 873 N.W.2d at 754. We again reject the State's invitation to disturb our long line of cases generally refusing to adopt the *Griffin* approach.

Yet, this case is in a different posture than in *Tyler*. In *Tyler*, there were arguably two crimes—namely, Tyler's initial hitting Daughenbaugh in the face and then the subsequent group beating. *Id.* at 752. Thus, it was possible that the jury convicted Tyler based on a belief that the first assault was the predicate crime and that the subsequent group beating was in furtherance of the original crime. *Id.* at 754. Thus, it was possible in *Tyler* that the jury did not believe that Tyler was guilty of second-degree murder as a principal or as an aider and abettor, but instead concluded that liability for murder arose only out of joint criminal conduct. *Id.*

The State suggests that this case is different from *Tyler* because in this case there was only one crime, namely, the joint group assault of Daughenbaugh. The key case is *Jackson*, 587 N.W.2d 764. In *Jackson*, the evidence showed that the defendant was hired by a woman to kill the woman's ex-boyfriend. *Id.* at 765. Jackson and the woman stopped the ex-boyfriend's vehicle and then Jackson shot and killed the ex-boyfriend. *Id.* The jury was instructed on theories of liability as a principal and on joint criminal conduct, but not aiding and abetting. *Id.* at 766. We concluded that Jackson must have been found guilty either on his own

conduct or as an aider and abettor, and thus it was not a reversible error for the district court to have instructed the jury on joint criminal conduct instead of aiding and abetting. *Id.*

In *Smith,* we repeated the principle that a flawed joint criminal conduct instruction does not require reversal "as long as there is no opportunity for the defendant to be found guilty based on anything other than the defendant's own conduct as a principal or aider and abettor of the crime charged." 739 N.W.2d at 294. In *Smith,* however, there were other collateral crimes—stolen guns, first-degree theft, and possession of methamphetamines—that could have supported a conviction on joint criminal conduct. *Id.* at 291, 294–95.

Here, however, for Shorter there are no predicate nonhomicide crimes that could have served as a basis for vicarious liability for subsequent crimes in furtherance of the original crime. The only crime of Shorter's that could possibly support a joint criminal conduct theory for second-degree murder is participation in the group assault on Daughenbaugh prior to his death. If the jury found Shorter participated in the group assault on Daughenbaugh, however, he would also necessarily be guilty of second-degree murder based on liability as a principal or under an aiding and abetting theory. As a result, in this limited situation, *Jackson* applies and a retrial is not required. *See* 587 N.W.2d at 766.

**III. Testimony of Perkins Outside the Scope of the Minutes of Testimony.**

**A. Introduction.** Iowa Rule of Criminal Procedure 2.5(3) states,

> *Witness names and minutes.* The prosecuting attorney shall, at the time of filing such information, also file the minutes of evidence of the witnesses which shall consist of a notice in writing stating the name and occupation of each witness upon whose expected testimony the information is based,

and a full and fair statement of the witness' expected testimony.

In this case, the minutes of testimony did not state that Perkins would identify Shorter as one of the assailants. The minutes simply stated that Perkins witnessed the assault and saw "ten to fifteen individuals hit, kick and stomp on Mr. Daughenbaugh." The minutes stated that Perkins "would testify to all of these matters in detail."

A pretrial deposition was taken of Perkins. Perkins testified at her deposition that she was too busy trying to save Daughenbaugh's life and not paying attention to who was doing the beating or stomping to make an identification.

At trial, however, Perkins, after repeated questioning by the prosecution, identified Shorter as a person who jumped on Daughenbaugh's face:

> Q: So you identified someone for the police from a photograph; is that right? A: Yes, ma'am.
>
> Q: That was involved in stomping on Richard Daughenbaugh? A. Yes.
>
> Q: And today you can't recall who that person is? A: I just—I don't know if because I want to block it out of my mind. I don't know. I have a lot of things on my mind right now. So I am just kind of —
>
> Q: All right. And you're also required to answer truthfully. So I need you to tell the truth, if you remember who this person is that you identified or not. A: Yeah. I remember that one over there in the checkered shirt.
>
> . . . .
>
> Q: If you're telling me that you recognize one of the people in the court room today as being involved in stomping on Richard Daughenbaugh, yes, I would like for you to describe for me where he's sitting and what he's wearing.

At this point, Perkins identified James Shorter.

Perkins also identified Yarvon Russell as "stomping" on Daughenbaugh. She conceded that she could not identify all of the people assaulting Daughenbaugh because "they were taking turns jumping up in the air and stomping on him."

On cross-examination, Shorter confronted Perkins with her deposition testimony:

> Q: Ma'am, I've shown you a deposition transcript. Do you recall saying this? A: Yeah, I do.
>
> Q: What did you say at the time? A: That I was too busy trying to save that man to remember if it was him.
>
> Q: And that you weren't paying attention to who was actually doing the beating or stomping? A: Yes.
>
> Q: And at that time you weren't able to say who that person was or make any identification; is that right? A: No, I wasn't.

Shorter did not object to Perkins's identification testimony at trial. Shorter filed a motion for a new trial, however, based on newly discovered evidence related to Perkins's eyewitness testimony. In the posttrial hearing on the motion for a new trial, Shorter called DeMarco Turner as a witness. Turner testified that sometime in May, apparently during Shorter's trial, he ran into Perkins at the courthouse. According to Turner, Perkins told him she was testifying in a murder case "trying to get probation" or "to get probation." Turner thought the charges against Perkins involved drug charges and driving while barred.

The day of the conversation with Perkins, Turner himself received a sentence and was incarcerated in the same cell pod as Shorter in the Polk County jail. Turner testified he told Shorter about the conversation he had had with Perkins at that time.

In response, the State emphasized that Perkins did not have a deal to testify and that Turner did not testify that she did. The State further

argued that there was no suggestion that Perkins did not testify truthfully at trial.

The district court denied the motion for a new trial based upon Turner's testimony. The district court noted that Turner conversed with Shorter on the very same day as the conversation with Perkins and thus the defense should have discovered the information with due diligence. The district court also stated that it did not believe the testimony would have changed the result of the trial.

**B. Standard of Review.** The claim that Shorter's counsel should have objected to Perkins's identification testimony comes to us in the context of ineffective assistance of counsel. The parties agree that in ineffective-assistance-of-counsel cases, the defendant must show both that counsel breached a duty to the defendant and the defendant was prejudiced. *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984).

**C. Positions of Parties.** Shorter claims that Perkins's testimony was a complete surprise to the defense. According to Shorter, the defense expected Perkins to testify about the context of the fight, not that Shorter participated in the crime. According to Shorter, the pretrial deposition of Perkins was not harmful to Shorter. Instead, according to Shorter, Perkins became "a star witness" at trial.

Shorter asserts that his trial counsel provided ineffective assistance of counsel by failing to object to Perkins's identification testimony as outside the scope of the minutes in violation of Iowa Rule of Criminal Procedure 2.5(3). He further asserts that counsel was ineffective for failing to seek a mistrial as a result of the unexpected testimony.

Shorter claims prejudice because he could have cross-examined Perkins more effectively if he had notice of her testimony. Shorter claims that even a cursory review of her criminal record would have reflected that at the time of her testimony, she had pending charges for driving while barred.

Shorter further cites the posttrial testimony of Turner. Shorter points out that Perkins's pending charges were dismissed two weeks after the trial. Even if there was no deal with Perkins related to her trial testimony, Shorter argues that he could have argued that the reason she changed her testimony was "to save her own skin."

Shorter further asserts that with more notice, Shorter could have successfully challenged the reliability of Perkins's testimony and prevented admission. According to Shorter, Perkins's identification was unreliable and was simply based on her repeatedly seeing Shorter in the criminal proceedings.

The State responds that the minutes provided Shorter with adequate notice. According to the State, Shorter knew that Perkins would testify about what she observed during the attack and her in-court identification was "consistent with the overall nature of the minutes." *State v. Ellis*, 350 N.W.2d 178, 182 (Iowa 1984).

The State further claims that Shorter failed to demonstrate prejudice. The State claims that the minutes put Shorter on notice of the necessity of further investigation of the witness's probable testimony. *See State v. Musso,* 398 N.W.2d 866, 868 (Iowa 1987). Further, the State argues that Perkins's in-court identification was cumulative of the testimony of Detective Garcia that Perkins had circled a photo of Shorter and identified him as one of Daughenbaugh's assailants, the testimony of L.S. that she saw Shorter kick Daughenbaugh, and the testimony of B.B.

that Shorter was part of the crowd that surrounded Daughenbaugh when he was being beaten.

**D. Iowa Caselaw Regarding Pretrial Disclosure in Criminal Cases.** In Iowa, the question of the degree to which the prosecution is required to disclose to the defendant the facts underlying a prosecution has been controversial in our courts since the beginning of statehood. For example, in *State v. Bowers*, the court considered whether a witness could testify in a criminal trial beyond the scope of the minutes of the witness's testimony before the grand jury. 17 Iowa 46, 50 (1864). Chief Justice Wright noted that he was "instructed" to announce the majority view that the requirement that a defendant be presented with minutes of testimony of a witness before the grand jury did not require the prosecution to "exclude anything else he may know or recollect on the subject" in a subsequent prosecution. *Id.* Chief Justice Wright, however, indicated that the very object of providing minutes testimony to be returned with an indictment would be practically defeated by the majority's approach. *Id.* at 51.

The divergence of approach to disclosure obligations of the prosecution in *Bowers* resurfaced in *State v. Miller*, 259 Iowa 188, 142 N.W.2d 394 (1966). In *Miller*, the court considered disclosure under section 780.10 of the Iowa Code which required that notice be given of "the substance of what he [the prosecutor] expects to prove by him [the witness] on the trial." *Miller*, 259 Iowa at 195–96, 142 N.W.2d at 399 (quoting Iowa Code § 780.10 (1962)). The minutes of testimony indicated that a Detective Petersen was to testify regarding admissions made by the defendant. *Miller*, 259 Iowa at 195, 142 N.W.2d at 399. Petersen's testimony, however, was suppressed by the trial court. *Id.* At trial, the state offered testimony from Detective Iversen. *Id.*

A five-member majority of the court held that the minutes were adequate. *Id.* at 196, 142 N.W.2d at 399. The majority emphasized that the defense knew the admissions were made to two police officers and also knew the general nature of the claimed admissions. *Id.* at 196, 142 N.W.2d at 399. The majority emphasized that although the minutes were brief, mere brevity does not prevent a witness from testifying. *Id.* The majority further noted that the state is not limited to the minutes or notice in its examination of witnesses. *Id.*; *see also State v. Thom*, 236 Iowa 129, 131, 17 N.W.2d 96, 97 (1945); *State v. Harding*, 204 Iowa 1135, 1150, 216 N.W. 642, 649 (1927).

Justice Becker, for himself and three other justices, dissented. *Miller*, 259 Iowa at 199, 142 N.W.2d at 401 (Becker, J., dissenting). The dissent emphasized that Detective Iverson testified with respect to two separate sets of admissions by the defendant. *Id.* at 200, 142 N.W.2d at 402. According to the dissent, one set of admissions was fully disclosed in the minutes, but the other set was not disclosed. *Id.* The dissent noted that the prosecution "strongly relied" upon the fact that the defendant gave two versions of the story in urging the sufficiency of the evidence to sustain the conviction. *Id.* The dissent emphasized that "[n]o hint of this deviation" in the defendant's admissions was contained in the minutes. *Id.* at 200–01, 142 N.W.2d at 402. The dissent regarded the court's casual approach to the statutes as amounting to "judicial repeal of a legislative enactment." *Id.* at 204, 142 N.W.2d at 404.

We next considered a challenge to testimony as outside the minutes in *State v. Salter*, 162 N.W.2d 427 (Iowa 1968). In *Salter*, the original minutes indicated that the victim would testify that the defendant had assaulted her with intent to commit rape, but at trial, the victim testified that the "rape had been accomplished." *Id.* at 431. The

state, however, filed a notice of additional testimony indicating that the defendant "did commit rape." *Id.*

Over the dissent of Justice Becker and one other justice, the *Salter* majority found no infirmity. *Id.* at 431–32. The majority emphasized that a witness is not limited to the minutes in his actual testimony. *Id.* at 431. The court noted, however, that by filing the minutes of additional testimony, the state followed "the safer, better, and fairer practice" since the court had been far from unanimous in its prior cases on the subject. *Id.*

Although Justice Becker had been a dissenter in *Miller* and *Salter*, he relented in *State v. Cunha,* 193 N.W.2d 106, 108 (Iowa 1971). In *Cunha*, a defendant charged with murder and aggravated robbery challenged the testimony of a witness who identified the defendant as one of four men who committed one of the robberies in question. *Id.* at 110. The minutes revealed that the witness would "describe the subjects she saw involved in the robbery" and would testify that "after the robbery she was able to identify the defendant Thomas Hinsey from a group of photographs of possible suspects." *Id.* At trial, the witness also identified Cunha as one of the robbers. *Id.* The defendant claimed surprise. *Id.* The *Cunha* court rejected the defense challenge to the testimony with the brief observation that a witness identified in the minutes was not limited to the minutes in subsequent testimony. *Id.* at 111.

If our law was frozen in place in 1971, *Cunha* would be substantial authority supporting the position of the State in this case. But the law has evolved. That evolution is reflected in *State v. Walker,* 281 N.W.2d 612 (1979).

In *Walker*, the minutes of testimony indicated that a witness would testify regarding seeing the defendant in the rear of a motor supply company with another person looking at tires which were later stolen from the building. *Id.* at 614. At trial, however, the witness testified regarding business records and the lack of a receipt for the sale of tires. *Id.* We held that the testimony of the witness was beyond the scope of the minutes and reversed the defendant's conviction for third-degree theft. *Id.* at 615.

We began our opinion in *Walker* by considering whether the adoption of Iowa Rules of Criminal Procedure in 1978, in particular rules 4(6)(a) and 5(3)—the predecessor to rule 2.5(3)—worked a substantive change from the previous statutory requirement of Iowa law related to disclosure of minutes of testimony. *Id.* at 613. We concluded there was a substantial change in law. *Id.* We noted that the question of the scope of disclosure in minutes had been "hotly contested" throughout the years by defense counsel and "frequently the subject of criticism by members of this court." *Id.* We cited the holding in *Cunha* that a witness is "not limited to those minutes in his actual testimony." *Id.* (quoting *Cunha*, 193 N.W.2d at 111). We noted that "[t]his rule has been severely criticized, both from within and without the court." *Id.*; *see Miller*, 259 Iowa at 199, 142 N.W.2d at 401.

We noted it was in this setting that the language of rule 5(3) was adopted. *Walker*, 281 N.W.2d at 613. We concluded that the purpose of the changes was "to assure minutes which would eliminate most claims of foul play and would provide meaningful minutes from which a defense could be prepared." *Id.*

We then considered whether the witness's testimony regarding business records was sufficiently noticed in the minutes. *Id.* at 614. We

explained that minutes need not detail "each circumstance of the testimony," but must be sufficient to fully and fairly "alert defendant generally to the source and nature of the evidence against him." *Id.* We noted that even the state conceded that it did not know about the business records until trial was underway. *Id.* The minutes did little more than identify the witness and state the conclusion that the tires in question were stolen. *Id.* We stated, "Under the new rules defendant is entitled to more." *Id.* We held that the new evidence should have been excluded on the ground that it was outside the scope of the minutes. *Id.* at 615.

Since *Walker,* we have considered a number of cases involving rule 5(3) with mixed results. In *State v. Olsen,* we reversed a conviction where the minutes revealed that a peace officer would testify regarding evidence obtained from a vehicle, tagged packages, and receipt of a BCI criminalist report, but did not disclose that the police officer was a DCI agent with training and expertise in drug investigations. 293 N.W.2d 216, 220–21 (Iowa 1980). In *Musso,* 398 N.W.2d at 868, and *State v. Waterbury*, 307 N.W.2d 45, 51 (Iowa 1981), we found that testimony exceeded the scope of the minutes but held that there was no reversible error because the defendant was not surprised by the testimony. In several other cases, we found that the minutes of testimony were sufficient to provide notice of testimony offered at trial. *Ellis,* 350 N.W.2d at 182; *State v. Lord*, 341 N.W.2d 741, 743 (Iowa 1983); *State v. Ristau,* 340 N.W.2d 273, 275 (Iowa 1983).

In sum, the question of the scope of proper disclosure by the prosecution of minutes of evidence prior to trial has been hotly contested. As indicated in *Walker*, caselaw prior to 1978 is undermined by the advent of Iowa Rule of Criminal Procedure 5(3), now rule 2.5(3),

which amounted to a substantive change in law designed to promote greater disclosure. 281 N.W.2d at 613. Notwithstanding the more stringent requirements of Iowa Rule of Criminal Procedure 2.5(3), there is no requirement that the minutes of testimony provide a complete catalogue of witness testimony at trial, but only that the defense be placed on fair notice and not subject to surprise testimony.

**E. Development in the Law of Eyewitness Identification.** This case, of course, involves the lack of disclosure in minutes that Perkins would identify Shorter as one of Daughenbaugh's attackers. The reliability of eyewitness testimony has been the subject of intense commentary in academia and in the courts. According to one article, "eyewitness misidentification is by far the most frequent cause of erroneous convictions." Samuel R. Gross, *Loss of Innocence: Eyewitness Identification and Proof of Guilt*, 16 J. Legal Stud. 395, 396 (1987). Yet, juries often attach great weight to eyewitness identification without consideration of reliability. *See State v. Hunt*, 69 P.3d 571, 576–77 (Kan. 2003) (noting that juries "usually attach great weight to eyewitness identification, while others involved in a trial know and other disciplines have documented that such identification is often unreliable").

Preparing for eyewitness identification is an essential responsibility of defense counsel. Eyewitness testimony may have a dramatic influence on overall defense strategy or theory of the case. Defense counsel must consider a pretrial motion to suppress. Voir dire may be used to educate the jury about honestly mistaken witnesses. Defense counsel must be prepared to explore the potential for error in the identification process through effective cross-examination. Cross-examination, however, is not likely to be effective when a person is genuinely mistaken about past events. Consideration should be given to obtaining expert witness

testimony of the problems with eyewitness identification. *See State v. Schutz*, 579 N.W.2d 317, 319 (Iowa 1998) (holding admission of expert witness on eyewitness identification within sound discretion of the court); *see also People v. McDonald*, 690 P.2d 709, 725–26 (Cal. 1984) (en banc) (holding exclusion of expert on reliability of eyewitness testimony was an abuse of discretion), *overruled on other grounds by People v. Mendoza*, 4 P.3d 265, 286 (Cal. 2000). Special instructions for the jury may need to be considered. Summations must be designed to deal with the eyewitness identification.

Many of the most troublesome cases involve identification of strangers. Careful consideration by counsel of eyewitness identifications extends to identifications of persons known to the witness and not simply to identification of strangers. James E. Coleman Jr., et al., *Don't I Know You? The Effect of Prior Acquaintance/Familiarity on Witness Identification*, 36-Apr. Champion 52, 53–54 (April 2012). Without timely disclosure of eyewitness identification, defense counsel's ability to mount an effective defense may be substantially impaired.

**F. Discussion.** In light of the developments in our caselaw and the importance of eyewitness identification in a criminal trial, we conclude that under Iowa Rule of Criminal Procedure 2.5(3), the minutes of testimony must disclose eyewitness testimony. Eyewitness testimony is a central part of trial and cannot be confronted by defense counsel on the fly. Although the prerule 2.5(3) case of *Cunha* is to the contrary, we think it clear that under the more demanding approach adopted by *Walker*, eyewitness identification must be disclosed by the prosecution.

Yet, this general rule does not necessarily entitle Shorter to relief. This case has its peculiarities. While there is nothing in the minutes to indicate that Perkins would identify Shorter as one of the persons kicking

Daughenbaugh during the assault, the defense was on notice that Perkins was at the scene and would testify about the events leading to Daughenbaugh's death. As a result, the defendants took the deposition of Perkins and defense counsel asked Perkins point-blank if she could identify Shorter. She did not make the identification at her deposition.

Ordinarily, we think it incumbent upon the State to disclose in the minutes of testimony if a witness will identify a defendant as engaging in criminal conduct. The record here, however, does not establish that the State knew, in advance of trial, that Perkins would identify Shorter when she took the stand. While at trial the prosecution pressed Perkins and successfully got her to identify Shorter, Shorter has not established that the prosecution had prior knowledge that such testimony would be forthcoming.

In addition, it is not entirely clear what Shorter's trial counsel knew. Counsel for both Shorter and Russell were able to cross-examine Perkins by confronting her with her testimony in her deposition indicating that she could not specifically identify the perpetrators. It is possible that although the minutes of testimony did not specifically mention that Perkins would identify Shorter, they were nonetheless prepared for the eventuality that she would make an in-court identification and made appropriate strategic decisions. Under our caselaw, a defendant is not entitled to relief due to defective minutes under rule 2.5(3) when the defense is not surprised by the subsequent testimony. Further, Shorter's counsel may have made the strategic decision that the trial was going well enough to take a pass on a motion for a mistrial.

Additionally, we do not have a clear picture regarding prejudice to the defendant. While this case is on direct appeal, the failure to object to

the eyewitness testimony and the failure to seek a mistrial is presented to us as an ineffective-assistance-of-counsel claim. Even if a breach of counsel's duty is present, Shorter acknowledges that he must show prejudice under *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. The record concerning potential prejudice has not been fully developed.

Because of the factual uncertainties surrounding the claimed ineffective assistance of counsel arising out of the deficient minutes, we conclude that this claim cannot be resolved on direct appeal and should be addressed in an action for postconviction relief.

**IV. Discussion of a Jury Question Outside the Presence of Defendant.**

**A. Introduction.** A criminal defendant has the right to be personally present at every stage of the trial. *State v. Wise*, 472 N.W.2d 278, 279 (Iowa 1991) (per curiam). Further, under Iowa Rule of Criminal Procedure 2.19(5), if the jury desires to be informed on any point of law arising from the case after it has retired, the court must conduct proceedings "in the presence of defendant and counsel for the defense and prosecution, unless such presence is waived." Iowa R. Crim. P. 2.19(5)(*g*).

Under our caselaw, there is no discretion regarding the presence of defendant and counsel. *State v. Griffin*, 323 N.W.2d 198, 201 (Iowa 1982). When the rule is violated, a presumption of prejudice is presumed unless the record shows to the contrary. *Id.*

In this case, after the case was submitted to the jury, the jury asked a question. Specifically, the jury asked, "Judge Staskal, if we determine a level of guilt, example second degree murder, does it have to include all lesser charges to be convicted of that charge?"

Judge Staskal and the lawyers all agreed to respond to the jury by simply asking it to "reread the instructions. They contain all of the applicable law in the case." Shorter was not present when the jury's question was discussed.

**B. Standard of Review.** This question is presented in the context of ineffective assistance of counsel and the parties thus agree that the two-pronged approach in *Strickland* is applicable. 466 U.S. at 687, 104 S. Ct. at 2064.

**C. Positions of the Parties.** Shorter maintains that the defendant's presence at such proceedings is "of greatest importance[] as he may be able to suggest to the court or counsel some information" and might be able to "except" to the ruling of the court. *See Griffin*, 323 N.W.2d at 201 (quoting *State v. Snyder*, 223 N.W.2d 217, 221 (Iowa 1974)). According to Shorter, the question posed by the jury "raised serious questions" concerning the effect of the jury's confusion over the meaning of crucial terms in the instructions. *Id.* Shorter argues that prejudice is inherent as it is difficult to know what exactly the jury was even talking about in the question.

The State responds that it would have been a "logistical nightmare" to get three codefendants to court on short notice as the jury question came in at 3:40 p.m., and shifts were changing, and people would be getting off work at 4:30 p.m.

The State further argues that even if there was a breach, there was no prejudice. The State notes the presumption of prejudice arises only when both the defendant and counsel are absent. *Id.* at 199–201. Further, the State contends there cannot possibly be prejudice when the judge's response to the question was "reread the instructions."

**D. Discussion.** At the outset, we reject the State's argument that the practical considerations raised provide a defense to Iowa Rule of Criminal Procedure 2.19(5)(*g*). Our rules of criminal procedure are not applicable only when convenient to the State. We decline to approach our rules as only suggestions, guidelines, or best practices.

The leading case in the area is *Griffin*, 323 N.W.2d 198. As Shorter points out, *Griffin* held—under a precursor to our current rule—that the district court has no discretion regarding the presence of counsel and the parties when the jury raises a point of law. *Id.* at 201. In *Griffin*, the jury was struggling over the definition of "physical injury" and "assault." *Id.* at 199. Without consulting with counsel or the parties, the district court instructed the jury, "You will have to define the terms from the language given in the instructions and reconcile any definitions as best you can by reading the instructions." *Id.* We concluded that violation of the court rule gave rise to a presumption of prejudice and that the response to the jury's serious question over crucial terms could have influenced the result. *Id.* at 201.

*Griffin*, however, is distinguishable. In *Griffin*, neither the party nor counsel was present. *See id.* at 199. Thus, the defendant was unrepresented when the court responded to the important question raised by the jury. *Id.* Here, counsel was present. Thus, it cannot be said that the defendant was unrepresented. It can be said, however, that the defendant was entitled to be present.

The record reveals that convenience may have played a role in the decision to proceed without the defendant. What we do not know, however, is whether the defendant waived his right to be present. The record does not provide us with a factual basis to determine this

question, and if it were important, it would need to be raised on a more developed record in a postconviction-relief proceeding.

Nonetheless, we agree with the State's position on the prejudice issue. The question posed by the jury may have been confusing, but Shorter does not offer any suggestion as to how his participation in the proceedings would have changed matters. Although the district court's instruction to the jury to "reread the instructions" was similar to that provided in *Griffin*, the key difference is that Shorter's counsel was present and agreed to the instruction.

Shorter concedes that the proper test in this case when counsel is present for the proceedings but fails to insist on the presence of the defendant, is provided under *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. Based on our review of the record, there is certainly no reasonable probability that the outcome of trial would have been different if the defendant had been present when the district court and the attorneys agreed to simply instruct the jury to "reread the instructions." Shorter has not suggested to us how the proceedings would have been different had he been present. We therefore hold that Shorter has failed to show prejudice and thus has not demonstrated ineffective assistance of counsel.

**V. Failure of Counsel to Request Eyewitness Identification Instruction.**

**A. Introduction.** At trial, the State offered eyewitness testimony from Perkins and L.S. identifying Shorter as a person who participated in the assault on Daughenbaugh. The trial court, however, did not use the Iowa State Bar Association (ISBA) instruction on eyewitness testimony or any similar instruction. The ISBA Model Criminal Jury Instruction 200.45 on eyewitness identification instruction tells the jury that in

evaluating an eyewitness identification, the jury may consider "[i]f the witness had an adequate opportunity to see the person at the time of the crime," and "[i]f an identification was made after the crime . . . [to] consider whether it was the result of the witness's own recollection." Iowa State Bar Ass'n, Iowa Criminal Jury Instruction 200.45 (2012). The instruction further provides that "[a]n identification made by picking the defendant out of a group of similar individuals is generally more reliable than one which results from the presentation of the defendant alone to the witness." *Id.* Finally, the instruction provides that the jury should consider "[a]ny occasion in which the witness failed to identify the defendant or made an inconsistent identification." *Id.*

**B. Standard of Review.** The parties agree that in order to support a claim of ineffective assistance based upon failure to provide an instruction related to the evidence, the defendant must show both that counsel breached the standard of care and that the defendant was prejudiced by counsel's breach. *See Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064.

**C. Positions of the Parties.** Shorter claims that in light of the importance of the eyewitness testimony in this case, his trial lawyer should have requested the instruction. Shorter notes that several features of the instruction might have helped him. He notes that counsel could have argued based upon the language in the instruction involving the witness's opportunity to observe the crime, that Perkins's identification was questionable in light of darkness and the exigencies of the situation.

Shorter further argues that the instruction related to subsequent eyewitness identification would have assisted counsel in arguing that the identifications of Perkins and L.S. were based upon their presence at trial

proceedings rather than upon true recollection. Finally, Shorter argues that the instruction would have assisted Shorter in arguing that the jury should consider the accuracy of the Perkins and L.S. identifications in light of inconsistencies when they were asked to identify persons participating in the assault.

The State responds by noting that most of the ISBA Model Instruction on eyewitness identification would not have assisted Shorter. The State argues that Perkins testified that she observed the defendant from point-blank range, declared that the visibility was good because the area was well-lit, and identified Shorter in a photo lineup less than twenty-four hours after the crime as participating in the assault. Thus, the State argues the instruction would have helped the prosecution on these points. The State argues that although Perkins stated she identified the defendants because she "kept looking" at them, Perkins also clarified, "I keep seeing their face[s]. I'm going to remember who stomped. I know I circled his face. . . . I know these people did it, and I don't care what nobody says."

In sum, because the instruction would have hurt as much as it helped, it was not a breach of duty for Shorter's counsel not to request it. The State further suggests that the repeated and consistent eyewitness identification by L.S., coupled with Shorter's statement to Officer Peak that he did kick Daughenbaugh—if only to see if he was okay—placed Shorter at the crime scene. *See State v. Tobin*, 338 N.W.2d 879, 881 (Iowa 1983) (citing corroborating evidence as proportionately lessening the need for an eyewitness instruction).

In the alternative, the State argues that Shorter has failed to show prejudice. The State points out that the jury was generally instructed in determining credibility of witnesses to consider whether a witness had

made inconsistent statements. *Id.* (citing jury instruction regarding credibility of witnesses as mitigating factor in case involving failure to instruct on eyewitness identification). In addition, the State suggests that absence of any specific eyewitness instruction did not prevent Shorter from making his arguments regarding the reliability of identification in closing arguments to the jury.

**D. Discussion.** There is no question that Shorter would have been entitled to the eyewitness instruction if counsel had requested it. But that is not the question before us. The question is whether Shorter's counsel breached a duty to him by failing to ask for the instruction and whether as a result of this omission, Shorter has shown that it is reasonably probable that the result in this case would have been different.

On the record before us, we conclude that Shorter simply cannot show a reasonable probability that the result at trial would have been different if the trial court has provided the jury with the ISBA Model Instruction on eyewitness identification. As the State suggests, it is debatable which party would have benefitted the most from the instruction. Further, the general instructions given to the jury gave Shorter's counsel a clear avenue to attack the inconsistencies in Perkins's eyewitness identification testimony. *See id.* And, much of the eyewitness identification instruction embraces commonsense notions that would not likely have escaped a conscientious jury unaided by the ISBA instruction. As a result, although we certainly do not discourage the use of the ISBA eyewitness identification instruction, we conclude that Shorter is not entitled to a new trial based on the failure of his counsel to request the eyewitness instruction. *See id.*

**VI. Conclusion.**

For the above reasons, we vacate the opinion of the court of appeals and affirm the judgment of the district court.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**