**IN THE COURT OF APPEALS OF IOWA**

No. 16-1283
Filed December 20, 2017

**STATE OF IOWA,**
　　　Plaintiff-Appellee,

**vs.**

**RICKY KEASLING,**
　　　Defendant-Appellant.
_____

　　　Appeal from the Iowa District Court for Wapello County, Myron L. Gookin, Judge.

　　　A defendant appeals his conviction for first-degree murder and first-degree burglary. **AFFIRMED.**

　　　Alfredo G. Parrish of Parrish, Kruidenier, Dunn, Boles, Gribble, Gentry, Brown & Bergmann, L.L.P., Des Moines, for appellant.

　　　Thomas J. Miller, Attorney General, and Sharon K. Hall, Assistant Attorney General, for appellee.

　　　Heard by Vogel, P.J., and Tabor and Bower, JJ.

**VOGEL, Presiding Judge.**

Ricky Keasling, convicted of murder in the first degree and burglary in the first degree, asserts his trial counsel was ineffective for failing to object to the felony-murder instruction, failing to seek an eyewitness-identification instruction, and failing to obtain an eyewitness expert. Further, Keasling asserts the district court erred in excluding a witness from testifying at trial, or in the alternative, trial counsel was ineffective for failing to timely disclose the witness. For the reasons stated herein, we affirm his conviction.

## I. Background Facts and Proceedings

Darrell Teeter was murdered on August 11, 2014, at the same location where he lived and worked, the Main Street Bait Shop in downtown Eldon. The bait shop was in the front of the building, and Teeter's residence was in the back. Teeter had been ill and undergoing dialysis a few days a week, and he had been prescribed hydrocodone for chronic pain.

A few days prior to his death, Teeter's friend, Peter Saner, stopped by the bait shop in the morning on his way to work to wake up Teeter. Upon waking, Teeter discovered his cash drawer was empty and his hydrocodone pills were missing. Teeter reported the theft. Teeter remarked to Saner, "the Keasling boy" had asked him for hydrocodone but Teeter did not have any at the time. On August 10, Teeter was awakened by someone pounding on his door at approximately 3:30 a.m. The pounding stopped once Teeter turned on his lights.

On August 11, Saner stopped by the bait shop just before 7:00 a.m.; he knocked on the door but received no answer. He walked around the back of the shop and found a window open and the air conditioning unit still running, but the

unit was laying on the floor. He could see Teeter lying on his couch. Saner climbed through the window, observed Teeter's body, and called 911. While waiting for the police to arrive, Brad McClure drove by, and Saner handed him the keys to a skid loader for a job Saner was working on.

Investigators found the living room to be in complete disarray with empty bottles of hydrocodone. The doors of Teeter's two vehicles were slightly ajar, and papers found inside were disturbed. Police removed the pieces of siding next to the window where the air conditioning unit had been located for fingerprint analysis. The bullet removed from Teeter's head and the shell casing found outside Teeter's window were consistent with a .22 long-rifle bullet. Police questioned Keasling, who denied taking any prescription medications other than his own and who said Teeter once paid one of Teeter's workers in hydrocodone pills instead of money. Keasling also said he had been in the bait shop to buy fishing supplies and had performed construction work for Teeter, but he had never been in the back, residential portion of the building.

Several witnesses provided pieces of information to the investigators. Upon learning of Teeter's death, his friend, Jim Knaak, told the police that Teeter said Keasling had been offering to buy hydrocodone pills from Teeter. William Hilliard spoke to police about his observations on the night in question, as he was on a walk that evening on the bike path near the bait shop. Hilliard had observed a pickup truck hauling concrete construction equipment and had memorized the license plate. Seth Yochum indicated he observed Keasling drive his truck near the bait shop in the early morning hours of August 10, park the truck, and walk in the direction of the bait shop. Additional evidence linked Keasling with a .22 pistol.

Witnesses testified they heard gunshots near the river approximately two weeks prior to Teeter's death and observed a white pickup truck similar to Keasling's work truck, which he used to haul concrete equipment. When police investigated the location where witnesses heard gunshots, they found six spent .22 pistol casings.

Police executed a search warrant on Keasling's person and his grandmother's house, where Keasling resided. They found approximately fourteen hydrocodone pills on his person, some stamped M366 and others stamped M357. Pills marked M366 were later found at Teeter's bait shop. Fingerprint testing and analysis revealed Keasling's fingerprints at the bait shop. Specifically, Keasling's prints were found on two pieces of aluminum siding next to the window where the air conditioning unit had been located, one pill bottle next to Teeter's television stand, one pill bottle from the living room, and another pill bottle from behind the counter of the bait shop. Additionally, Keasling's prints were found on papers located inside Teeter's car and truck.

On January 2, 2015, Keasling was charged with first-degree murder, in violation of Iowa Code sections 707.1 and 707.2(1)(a) or (b) (2014), and first-degree burglary, in violation of Iowa Code sections 713.1 and 713.3(1)(b) or (c). Trial began May 10, 2016, and the jury returned guilty verdicts on both counts. On June 10, 2016, Keasling filed a motion for new trial and motion in arrest of judgment. The motions were denied. Keasling was sentenced to life without parole for first-degree murder and twenty-five years for first-degree burglary, to run concurrently.

Keasling appeals.

## II. Standard of Review

We review ineffective-assistance-of-counsel claims de novo. *State v. Ondayog*, 722 N.W.2d 778, 783 (Iowa 2006). To establish a claim of ineffective assistance of counsel, the defendant must prove by a preponderance of the evidence: (1) trial counsel failed to perform an essential duty and (2) prejudice resulted from this failure. *State v. Lane*, 743 N.W.2d 178, 183 (Iowa 2007) (citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). Claims of ineffective assistance of counsel raised on direct appeal are generally preserved for postconviction-relief proceedings for the development of a sufficient record and to allow the attorney an opportunity to defend his or her actions. *See State v. Allen*, 348 N.W.2d 243, 248 (Iowa 1984). However, where the record on appeal is sufficient to allow us to determine that either prong of an ineffective assistance claim is lacking, we may decline to preserve the issue and may instead address the claim on direct appeal. *State v. Brown*, 656 N.W.2d 355, 364 (Iowa 2003).

We review the record to determine if the court abused its discretion in excluding a witness as a sanction for failure to comply with the disclosure of a witness. *State v. Babers*, 514 N.W.2d 79, 82 (Iowa 1994). The sanctions are discretionary and will be reversed only if the trial court abuses its discretion. *Id*. An abuse of discretion will not generally be found unless the party whose rights have been violated suffered prejudice. *Id*.

## III. Ineffective Assistance of Counsel

### A. Felony-Murder Instruction

The district court instructed the jury it could convict Keasling of first-degree murder if it found either he acted willfully, deliberately, premeditatedly, and with the specific intent to kill Darrel Teeter or he killed Teeter while participating in the crime

of first-degree burglary.[1]   *See* Iowa Code §§ 707.2(1)(a) (premeditated killing), 707.2(1)(b) (killing while participating in a forcible felony), 702.11 (providing "[a] 'forcible felony' is any felonious child endangerment, assault, murder, sexual abuse, kidnapping, robbery, arson in the first degree, or burglary in the first degree").

Keasling claims his trial counsel should have objected to instructing the jury on the felony-murder alternative because the evidence at trial established only a single act caused injury to Teeter, which also caused his death.  Because first-degree burglary may be committed when a person inflicts bodily injury on any person, Keasling asserts the act of shooting Teeter was the same act as contained in the predicate felony.   *See* Iowa Code § 713.3.  To support his argument, Keasling relies on the following cases: *State v. Heemstra*, 721 N.W.2d 549, 557 (Iowa 2006) (holding felonious assault of willful injury could serve as the predicate offense for felony murder only in certain circumstances); *Goosman v. State*, 764 N.W.2d 539, 514 (Iowa 2009) (holding federal due process did not require retroactive application of *Heemstra*); *State v. Millbrook*, 788 N.W.2d 647, 650 (Iowa 2010) (finding the defendant committed an assaultive act sufficiently independent of the firing of the gun that resulted in the victim's death); and *State v. Tribble*, 790 N.W.2d 121, 129–30 (Iowa 2010) (upholding the conviction because substantial evidence supported a jury finding that head trauma and asphyxia were caused by separate acts).

---

[1] The verdict form simply stated the jury found Keasling "guilty of Murder in the First Degree" without distinguishing premeditated murder from felony murder.

Our court has dealt with the issue of merger in the context of the predicate felony of arson, noting:

> In *Heemstra*, our supreme court held that if the act causing willful injury as a forcible felony is the same act that causes the victim's death, the former is merged into the murder and cannot serve as the predicate felony for felony-murder purposes. *Heemstra*, 721 N.W.2d at 558. Accordingly, our court adopted what is known as the "merger rule." *Id.*

*State v. Tucker*, 810 N.W.2d 519, 521–22 (Iowa Ct. App. 2012). Our court also noted:

> [A]pplication of the felony-murder rule in the case of arson is consistent with the traditional purpose of the felony-murder rule: deterring people from committing those felonies that present a heightened risk of death to others by transforming the felony offense sought to be deterred into first-degree murder if a person is killed in the course of the felony . . . .

*Id.* at 522.

Our "supreme court has not extended the *Heemstra* merger rule beyond the context of felonious assaults." *Id.*; *accord Tribble*, 790 N.W.2d at 129; *Millbrook*, 788 N.W.2d 653–54. Although burglary contains an assault element, the merger rule has not been extended beyond felonious assaults to include burglary or other forcible felonies.[2] As noted in *Tucker*, "although the supreme court has seemingly

---

[2] Further, our court has declined to find counsel was ineffective for not challenging the felony-murder instruction when the predicate felony was robbery or assault with the intent to commit sexual abuse. *See Killings v. State*, No. 15-1061, 2017 WL 1735614, at *4-5 (Iowa Ct. App. May 3, 2017) (addressing assault with the intent to commit sexual abuse); *State v. McCoy*, No. 14-0918, 2016 WL 3269458, at *4-7 (Iowa Ct. App. June 15, 2016) (addressing the assault alternative to first-degree robbery); *see also State v. Pollard*, No. 13-1255, 2015 WL 405835 at *3-4 (Iowa Ct. App. Jan. 28, 2015) (addressing the assault alternative to first-degree robbery). First-degree burglary and first-degree robbery may be committed when a person inflicts bodily injury on any person. *See* Iowa Code §§ 713.3(1)(c), 711.2. Thus, even though an assault may occur during the commission of a burglary, robbery, or assault with the intent to commit sexual abuse, we have concluded the merger rule will not apply to such forcible felonies.

adopted a 'two separate acts' approach for felony-murder, we believe that approach is best served by limiting it to felonious assaults. To extend that approach to arson would effectively write arson out of the felony-murder statute." *See* 810 N.W.2d at 522; *accord Tribble,* 790 N.W.2d at 128. The same, we conclude, would apply to the assault alternative to first-degree burglary if the "two separate acts" approach is extended beyond felonious assaults. Therefore, we decline to find counsel was ineffective for not challenging the felony-murder instruction.

## B. Eyewitness-Identification Instruction

Keasling next asserts trial counsel was ineffective for failing to request an instruction regarding eyewitness identification. The State offered testimony from various witnesses who claimed to have either seen Keasling at Teeter's shop on or near the date he was killed, or had seen Keasling's truck either at the shop or near the river where spent shells were found, linking Keasling to the murder weapon. The trial court did not use the model instruction on eyewitness testimony or a similar instruction. Instruction 200.45 indicates the jury may consider:

> 1. If the witness had an adequate opportunity to see the person at the time of the crime. . . .
> 2. If an identification was made after the crime . . . consider whether it was the result of the witness's own recollection. . . .
> . . . .
> 4. Any occasion in which the witness failed to identify the defendant or made an inconsistent identification.

Iowa State Bar Ass'n, Iowa Criminal Jury Instruction 200.45. Keasling's trial counsel did not request the instruction. Keasling asserts his counsel was ineffective for failing to request the instruction because the instruction would have

given the jury guidance to test the reliability of each witness. Keasling notes the State primarily relied on witness identification of him and his truck.

As was the case in *State v. Shorter*, the State concedes Keasling likely would have been entitled to the eyewitness instruction had counsel requested it. *See* 893 N.W.2d 65, 86 (Iowa 2017). However, as in *Shorter*, Keasling cannot show a reasonable probability the result at trial would have been different if the court had provided the jury with the eyewitness-identification instruction. *See id.* In this case, the jury was provided the general instructions that inform the jury to "reconcile any conflicts in the evidence" and evaluate the various witnesses' testimony.[3] Keasling points to potential weaknesses in some testimony that could call into question a witness's memory, eyesight, vantage point, and level of intoxication. Yet each witness Keasling asserts has a weakness in his testimony was pressed on that weakness during cross-examination by defense counsel at trial. The jury was then instructed to use its "observations, common sense and

---

[3] Instruction No. 11 provided:

> Decide the facts from the evidence. Consider the evidence using your observations, common sense and experience. Try to reconcile any conflicts in the evidence; but if you cannot, accept the evidence you find more believable.
>
> In determining the facts, you may have to decide what testimony you believe.
>
> You may believe all, part, or none of any witness's testimony.
>
> There are many factors which you may consider in deciding what testimony to believe, for example:
>
> 1. Whether the testimony is reasonable and consistent with other evidence you believe.
>
> 2. Whether a witness has made inconsistent statements.
>
> 3. The witness's appearance, conduct, age, intelligence, memory and knowledge of the facts.
>
> 4. The witness's interest in the trial, their motive, candor, bias and prejudice.

experience" to "try to reconcile any conflicts in the evidence." As stated in *Shorter*, "much of the eyewitness identification instruction embraces commonsense notions that would not likely have escaped a conscientious jury unaided by the [model] instruction." *Id.* The same is true here. Thus, when the instructions given to the jury provided it with the tools needed to sort through the evidence and make its findings, Keasling cannot establish he was prejudiced by his counsel's failure to request the model instruction. *See id.*

### C. Eyewitness Expert

Next, Keasling asserts that since eyewitness identification was central to the State's case against him, trial counsel was ineffective for failing to obtain an eyewitness expert. Specifically, Keasling asserts expert testimony was necessary due to the threat of a mistaken eyewitness identification. *See* Gary L. Wells, *Eyewitness Identification Evidence: Science and Reform*, 29 Champion 12 (2005). Keasling contends this failure left the jury without the framework for assessing the discrepancies in the eyewitness testimony they heard, resulting in prejudice.

Our supreme court has noted that eyewitness testimony may have a dramatic influence on defense strategy or the theory of the case. *Shorter*, 893 N.W.2d at 81–82. Our supreme court went on to note:

> Voir dire may be used to educate the jury about honestly mistaken witnesses. Defense counsel must be prepared to explore the potential for error in the identification process through effective cross-examination. Cross-examination, however, is not likely to be effective when a person is genuinely mistaken about past events. Consideration should be given to obtaining expert witness testimony of the problems with eyewitness identification.

*Id.* at 82 (citing *State v. Schutz*, 579 N.W.2d 317, 319 (Iowa 1998)).

In addition to the general jury instructions aiding the jury in its determination of witness credibility, the jury was also presented with sufficient corroborating evidence supporting the identifications. Some witnesses provided eyewitness testimony regarding either Keasling or his truck. Other witnesses provided non-eyewitness testimony linking Keasling to Teeter's death. For instance, Saner testified Teeter was concerned "the Keasling boy" had stolen some of his hydrocodone pills after Teeter had declined Keasling's recent offer to purchase some of the pills; after Teeter's death, Keasling was found in possession of hydrocodone pills bearing the same identifying markings as those found in Teeter's possession.

Further, shortly before Teeter was killed, his gun had been stolen, and Keasling had bragged to his brother that he had recently acquired a "22 pistol," boasting in text messages about how well the gun shot. After the murder, investigators found a number of .22 rounds of ammunition in Keasling's possession. Keasling's truck had been seen near the river immediately after neighbors heard gunshots, and the shell casings found by the river were determined to have been fired by the same firearm as was fired at Teeter's residence. Additionally, although Keasling denied ever being in the residential portion of Teeter's building, Keasling's fingerprints were found both inside and outside that area, on hydrocodone pill bottles, as well as on items located in Teeter's vehicles. Thus, the jury was presented with considerable evidence that was not dependent on eyewitness testimony linking Keasling to the crime. Keasling, therefore, has not shown there is a reasonable probability the result of the trial would have been different if an expert on eyewitness identification had

testified. We conclude Keasling has not shown he was prejudiced by defense counsel's failure to present the testimony of an expert on eyewitness identification.

## IV. Witness Exclusion

Next, Keasling asserts the exclusion of a witness who could have provided exculpatory evidence was an extreme and unreasonable sanction, unsupported by prejudice to the State. On day seven of the trial, after the State had rested, Keasling's counsel sought to have Brad McClure testify for the defense. At a hearing outside the presence of the jury, Keasling's counsel explained to the court that he had become aware of McClure's testimony during the nine-day period prior to trial in which disclosure of additional witnesses was not permitted. *See* Iowa R. Crim. P. 2.13(3). Keasling's counsel made the strategic decision to call McClure as an undisclosed defense witness during trial rather than to supplement disclosure. After a brief summary of the substance of McClure's purported testimony, the State resisted, claiming McClure's testimony would be inadmissible hearsay. The district court agreed and excluded McClure's testimony.

The sanctions available to the district court when a defendant fails to comply with subsection (3) of rule 2.13 are found in subsection (4) of the rule, which states in pertinent part:

> If the defendant . . . does not disclose to the prosecuting attorney all of the defense witnesses (except the defendant and surrebuttal witnesses) at least nine days before trial, the court may order the defendant to permit the discovery of such witnesses, grant a continuance, or enter such other order as it deems just under the circumstances. It may, if it finds that no less severe remedy is adequate to protect the state from undue prejudice, order the exclusion of the testimony of any such witnesses.

Iowa R. Crim. P. 2.13(4); *see Babers*, 514 N.W.2d at 82. The district court, in choosing to exclude McClure as a witness, ruled:

> First of all, it appears to the court that although the defendant has referred to this proposed evidence at exculpatory, the court considers it more in line with being impeachment of Mr. Saner's testimony.
>
> Furthermore, that the State has rested its case in this matter. As the state's attorney points out, the defense evidence, if not concluded, at least is close to being concluded at this point in time, so we are far into and very close to the end of the presentation of evidence in this case. So the notice of this potential witness by the defense is very delinquent.
>
> Furthermore, based upon the statements of counsel made here today, they knew of the potential testimony of this witness within the nine-day period prior to trial and made a specific and strategic decision not to list this person as a witness for the defendant, and therefore, at this point in time to spring a witness on the State, the court considers to be unfair, and the proper remedy is to exclude the witness.

Because the State had rested its case, Keasling was close to resting his own defense, and the court viewed the evidence as impeachment rather than exculpatory, we do not find this choice of remedy to be an abuse of the district court's discretion.

Next, Keasling asserts his trial counsel was ineffective for failing to timely disclose McClure as a witness, causing him prejudice. Keasling argues his trial counsel's decision to withhold disclosure of McClure was due to a lack of diligence rather than due to an appropriate trial strategy. Keasling contends that due diligence would have revealed the likelihood that McClure's testimony would have been excluded due to nondisclosure.

Keasling must prove, by a preponderance of the evidence, both that counsel failed to perform an essential duty and that prejudice resulted. *Ledezma v. State*, 626 N.W.2d 134, 142 (Iowa 2001). Iowa Rule of Professional Conduct 32:1.3

requires lawyers to "act with reasonable diligence and promptness in representing a client." A lawyer who neglects to file documents with the court in a timely manner without an adequate excuse violates this rule. *See State v. Ary*, 877 N.W.2d 686, 705 (Iowa 2016). While strategic decisions made after "thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," strategic decisions made after a "less than complete investigation" must be based on reasonable professional judgments supporting the particular level of investigation conducted. *Ledezma*, 626 N.W.2d at 143. However, if the claim lacks the necessary prejudice, we can decide the case on the prejudice prong of the test without deciding whether the attorney performed deficiently. *Id.*

McClure's testimony at the hearing on Keasling's motion for new trial consisted of impeachment evidence against Saner. At trial, Saner testified he does not take hydrocodone, had been friends with Teeter for years, and "the Keasling boy" offered to purchase hydrocodone from Teeter. McClure testified he drove by Teeter's bait shop around 7:00 a.m. on August 11 to meet Saner before a job and Saner "flagged" him down as he approached. McClure testified Saner said he "found Mr. Teeter dead" and then asked McClure for hydrocodone. Saner then asked McClure to lie for him about finding Teeter's body on August 11. McClure indicated he knew Saner took "handfuls" of hydrocodone, regularly carried firearms, and associated with individuals who McClure "did not know what they were capable of." Although McClure testified he did not know what Saner's associates were capable of, he indicated he was not fearful of them.

As the district court noted:

Even assuming such evidence could not have been discovered earlier in the exercise of due diligence, evidence that Saner asked McClure to lie about their encounter merely goes to Saner's credibility as a witness. No other evidence ties Saner to the commission of the crimes.

Concerning Saner's credibility, a jury could conclude his credibility was successfully impeached. Or, a jury could just as easily conclude that Saner's testimony was credible and Saner only asked McClure to lie because he did not want McClure to publicly reveal at trial Saner was taking prescription pain killers that were not prescribed to him.

Bottom line, based upon the totality of the credible evidence presented, even if McClure had testified about Saner asking him to lie, and Saner's credibility as a witness was successfully impeached, the court concludes such would probably not have changed the result of the trial.

Saner was interviewed by police, provided a DNA sample, and provided fingerprint samples four times. Despite the presence of Saner's fingerprints in Teeter's residence, which is explained by Saner's admission to finding Teeter's body, no other evidence linked him to the killing. On our de novo review, we conclude there is no reasonable probability of a different outcome had counsel timely disclosed McClure as a witness. Accordingly, Keasling's ineffective-assistance-of-counsel claim fails.

## V. Cumulative Error/Plain Error

Finally, Keasling contends the cumulative error of his ineffective-assistance claims as asserted above should entitle him to a new trial. "Iowa recognizes the cumulative effect of ineffective-assistance-of-counsel claims when analyzing prejudice under *Strickland*." *State v. Clay*, 824 N.W.2d 488, 501 (Iowa 2012). If a claimant raises multiple claims of ineffective assistance of counsel, the cumulative prejudice from those individual claims should be properly assessed under the prejudice prong of *Strickland*. *Id.* If the court only considered the prejudice prong,

"the court can only dismiss the postconviction claim if the alleged errors, cumulatively, do not amount to *Strickland* prejudice." *Id*. at 501–02. Here, as to the claims counsel failed to request an eyewitness-identification instruction, failed to obtain the testimony of an eyewitness expert, and failed to timely disclose McClure as a witness, in which we only considered the prejudice prong, we do not find the cumulative effect of Keasling's attorney's actions or inactions rise to the level of *Strickland* prejudice.

Moreover, our supreme court does not recognize a "plain error" rule. *See State v McCright*, 869 N.W.2d 506, 607 (Iowa 1997) (citing *State v. Hutchison*, 341 N.W.2d 33, 38–40 (Iowa 1983)). We cannot do so in its stead. *See State v. Hastings*, 466 N.W.2d 697 (Iowa Ct. App. 1990) ("We are not at liberty to overturn Iowa Supreme Court precedent.").

## VI. Conclusion

Because Keasling's trial counsel was not ineffective for failing to object to the felony-murder instruction and no prejudice resulted from counsel's failure to request an eyewitness-identification instruction or obtain an eyewitness expert, we affirm. Also, the district court did not abuse its discretion in excluding witness testimony presented after the State rested and no prejudice resulted from counsel's untimely disclosure of the witness because the testimony was impeachment testimony.

**AFFIRMED.**