# IN THE COURT OF APPEALS OF IOWA

No. 22-0114
Filed October 11, 2023

**STATE OF IOWA,**
       Plaintiff-Appellee,

**vs.**

**DENISE SUSANNA O'BRIEN,**
       Defendant-Appellant.
_____

       Appeal from the Iowa District Court for Black Hawk County, Joel Dalrymple, Judge.


       A defendant appeals two convictions for murder in the first degree, claiming the evidence is insufficient. **AFFIRMED.**


       Christopher A. Clausen of Clausen Law Office, Ames, for appellant.

       Brenna Bird, Attorney General, and Richard J. Bennett, Special Counsel, for appellee.


       Heard by Greer, P.J., and Schumacher and Badding, JJ.

**BADDING, Judge.**

At 5:21 a.m. on April 22, 2018, Denise O'Brien texted her cheating boyfriend, Willie Traymone Phillips: "Karma comin 4 u. Hope u redy n i hope it hurt. . . . MONSTER." By 6:30 a.m., the house where Phillips was sleeping with his new girlfriend, Teryn, was engulfed in flames. Phillips and Teryn escaped, but a mother and child who lived in the home did not.

A jury found O'Brien guilty of two counts of first-degree murder for their deaths. O'Brien appeals, claiming the evidence is insufficient to support the convictions because it was "circumstantial in nature." We affirm.

**I.     Background Facts and Proceedings**

**A.     Prologue**

The murder charges against O'Brien stemmed from a house fire at 536 Dawson Street in Waterloo on April 22, 2018. The home was occupied by Teryn, her best friend Ashley, and Ashley's two children—nine-year-old J.S. and twelve-year-old A.S. Ashley and J.S. perished in the fire, though they weren't its intended targets.

O'Brien had been in a relationship with Phillips since 2014. About six weeks before the fire, Phillips started sleeping with Teryn. He was at her home daily, including the morning of the fire and the night before. Although Phillips and O'Brien lived together, Phillips described their relationship as "[u]p and down" and testified he saw other women. While Teryn was the only other woman he was seeing at the time of the fire, O'Brien knew that a third woman was pregnant with Phillips's child. And just nine days before the fire, on April 13, O'Brien knew that Phillips was at Teryn's place.

Teryn testified that on the morning of April 13, she was in bed with Phillips when she heard loud banging at her front door. As Teryn cracked the door open, O'Brien said, "This is Denise," and swung something metal at her. Teryn pushed the door shut and yelled for Phillips to call the police. O'Brien then busted out the front four windows to the home. According to Phillips, this all happened because Teryn—in an effort to "stir up the pot"—told O'Brien that Phillips was with her.

## B.     The Night Before the Fire

Despite that drama, Phillips kept seeing Teryn and living with O'Brien. On April 21, the day before the fire, Phillips was hanging out with O'Brien at their shared apartment, along with his friend Chuck Newman. Phillips and Newman were drinking and using marijuana and cocaine. Texting O'Brien that he would "[b]e back in 20," Phillips and Newman went to Teryn's just after 10:00 p.m., where they continued drinking and using drugs with Teryn. Ashley and her kids were in bed sleeping.

Once it became clear that Phillips was not coming "back in 20," O'Brien walked to Teryn's house. According to Phillips, O'Brien texted him at around 12:30 a.m. on April 22, telling him that she was outside. There was conflicting evidence about what happened next, but what is clear is that there was a contentious altercation. Without saying anything to Teryn, Phillips went outside to talk to O'Brien and calm her down. But then Teryn came outside, and O'Brien tried to take a swing at her. Phillips stepped in between the two women, pushing O'Brien and telling her to "get the fuck away from here." O'Brien kept trying to get at Teryn, hitting Phillips in the process. So Phillips testified that he "popped her ass back." Neighbors who were woken up by the argument said that Phillips did

more than just "pop" O'Brien. One recalled seeing "a woman on the ground and a man punching her and kicking her and they were yelling and screaming," while another woman was standing on the side of the street nearby. Another neighbor testified that Phillips was "beating the crap out of" O'Brien. That neighbor said when the fight was over, O'Brien told Phillips, "I hope this bitch can take care of you better than I did." The other neighbor remembered O'Brien saying, "You will never find somebody like me."

After the altercation, Newman drove O'Brien back to the apartment she shared with Phillips. O'Brien was not happy about going home, according to Phillips, because he wouldn't go with her. She repeatedly called Phillips's phone, but he blocked her number because he didn't want to talk to her. Newman described O'Brien as "still very upset, screaming. She was punching my dashboard, just very upset" during the ride home. According to Newman, after O'Brien threatened to kill herself several times, she "said that she should go up there and kill everyone at the house."

Newman went back to Teryn's after dropping O'Brien off. After doing some more drugs, Phillips, Teryn, and Newman went to a party at around 2:00 a.m. Newman left after about thirty minutes, but Phillips and Teryn stayed until 4:30 or 5:00 a.m. Teryn didn't remember leaving the party because she drank too much. Newman testified that he picked Phillips and Teryn up from the party and drove them back to Teryn's place on Dawson Street. He remembered that Teryn had her shoes in her hand. Data extracted from O'Brien's cell phone shows that at 5:19 a.m., which would have been around the time Newman dropped Teryn and Phillips off, O'Brien texted Phillips: "Why that nasty bitch got her ass fucked up

outside walkin around barefeet.  Lol u nasty."  Phillips testified that once he and Teryn got home, they went to bed in Teryn's room, which was on the second floor in the northwest corner of the house.  With no response from Phillips, O'Brien texted him again at 5:21 a.m.: "Karma comin 4 u.  Hope u redy n i hope it hurt oms u aint the traymone I fell in luv wit."  And then seconds later, "MONSTER."

### C.    The Fire

As Phillips was "dozing off," he noticed "[i]t started getting smokey."  All of a sudden, the bedroom door blew open and black smoke came billowing into the room.  Phillips said that he kicked the door shut and climbed out the bedroom window onto the roof of the back porch.  All Teryn remembered was waking up to the fire and Phillips yelling at her to get out the window.  A.S., the twelve-year-old child in the room next to them upstairs, testified that she woke up to the sounds of smoke alarms, her mother's voice, and her brother screaming.  Teryn, Phillips, and A.S. all made it out of their second-story windows in the back of the house and to the ground without serious injury.

A neighbor was driving home at about 6:30 a.m. when he saw the fire on Dawson Street, roughly two blocks away from where he lived.  He called 911 and reported the fire, noting "it's burning bad."  Video and photographic evidence taken by another witness who lived nearby shows the front of the house was engulfed in flames.  The neighbor who called 911 reported that people were in the house, including kids, and three individuals jumped out the back window.  A responding firefighter found Ashley and J.S. in their south bedroom—which overlooked the front porch of the house—while he was searching the upstairs.  It was apparent their injuries were not compatible with life.

Phillips testified that he went back to the apartment that he shared with O'Brien about twenty minutes after the fire. She was sleeping on the couch. Suspicious, Phillips smelled O'Brien's hands and looked around the apartment for any signs that she may have been involved in the fire. But he didn't find anything. O'Brien told officers later that day that Phillips had come home, told her about the fire, showered, and then left to get cigarettes at around 8:30 a.m.[1] The officers collected Phillips's clothes, plus a pair of jeans and white tennis shoes from O'Brien, though she was not a suspect until the next day when their investigation revealed more details about the fire.

### D.     The Investigation

Waterloo Fire Marshall Christopher Ferguson conducted a fire investigation and concluded "this was a what's known as an incendiary or intentionally set fire which means that somebody had intended for there to be a fire there where there normally otherwise should not have been." Ferguson explained the fire had two origins, one on the front porch on the south side of the home, and another on the steps to a back door on the northwest corner of the home. These were the only exits out of the home. Ferguson testified that the fire at the front porch was fueled by a couch and made its way into the house and up to the second story. The fire that started in the rear did not last long, "was not a very intense fire," and didn't go the inside the house. According to Ferguson, the south side of the home, where Ashley and her son slept, suffered the most extensive damage. Three samples of

---

[1] Their interaction with O'Brien was captured by one of the officer's body-cams.

wood taken from the rear steps of the home tested positive for the presence of gasoline.

A Kwik Star is located roughly two blocks southeast of 536 Dawson. The MidAmerican building in Waterloo is located about five blocks south and then one block to the west of the Kwik Star. And a home surveillance system was in use in the 800 block of Broadway Street just north of the Kwik Star. Officer Thomas Frein of the Waterloo Police Department's investigation unit obtained surveillance footage from all of these locations.[2] The following aerial map, admitted at trial as exhibit A-5, shows the locations of 536 Dawson Street (marked with a red icon in the upper left) and the Kwik Star (dark blue roof in lower right):



The home surveillance video shows a grayish silhouette wearing white shoes walking eastbound in an alley just to the north of the Kwik Star not long after

---

[2] Dawson Street intersects with Broadway Street just to the east of 536 Dawson Street. The Kwik Star is located on Broadway Street a little more than a block to the south of that intersection.

6:30 a.m.[3] Based on the evidence, the alley we are talking about is the east-west thoroughfare located just south of Dawson Street. The video shows the individual walking toward Broadway Street between the two buildings directly to the north of the Kwik Star. Cutting to exterior video from the Kwik Star, at 6:32 a.m., an individual is walking southbound on the west sidewalk of Broadway Street.

That person is wearing a gray sweatshirt, loose gray sweatpants, white shoes, and a black stocking cap put on as the person approached the Kwik Star. The interior camera on the entrance to the Kwik Star shows the person going into the store with the stocking cap pulled down over their eyes at 6:32 a.m. Officer Frein identified that person as O'Brien. Footage from other interior cameras shows her getting a fountain drink with a yellow lid. And in a closer shot, a camouflage shirt can be seen underneath the sweatshirt. O'Brien left the store at 6:34 a.m., walking south. One minute later, two fire trucks race by toward Dawson Street.

The next aerial map, admitted at trial as exhibit A-3, shows the location of the MidAmerican Building (red icon bottom left) in relation to the Kwik Star (blue icon top center):

---

[3] The time-stamp on the video says 5:37 a.m. Officer Frein testified this time-stamp was behind by roughly fifty-five minutes.



Video footage from the MidAmerican building shows a woman holding a cup with a yellow lid and wearing a camouflage shirt, blue jeans, and white shoes walk by the building, travelling southbound—in the direction of O'Brien's apartment—at 6:45 a.m. Officer Frein identified this person as O'Brien. Finally, footage taken by a traffic camera owned by the Iowa Department of Transportation, located further south and closer to O'Brien's apartment, captured a person with white shoes walking on a path to O'Brien's apartment at 7:03 a.m.

Officer Frein testified that a walk from Kwik Star to MidAmerican would take less than five minutes. Law enforcement canvassed the area but did not find any of the gray clothing O'Brien was wearing at the Kwik Star but then not wearing when she passed MidAmerican. However, Officer Frein testified that law enforcement did not have the video evidence until after those discarded clothes could have been gone.

Once they viewed that video evidence, law enforcement obtained a search warrant for O'Brien's apartment and interviewed her at the police station. During this interview, O'Brien told an investigator that she was on board with Phillips having relations with other women, noting she can't have any more kids and it's not her "place to stop him from being able to have kids." She even said that she and Teryn became friends after she found out Phillips was seeing her. At the end of the interview, an investigator seized O'Brien's cell phone and another pair of white tennis shoes she was wearing. None of the items taken from O'Brien, including jeans, gray sweatpants, and two black stocking hats, tested positive for gasoline. But data extraction from O'Brien's cell phone shows that O'Brien sent Phillips thirty-six text messages between 1:27 a.m. and 5:21 a.m., then the messages abruptly stopped.[4] The theme of those messages was O'Brien's displeasure with Phillips not coming home and her feeling of being betrayed despite her loyalty to Phillips. The calls logs show that O'Brien also tried to call Phillips four times between 3:02 a.m. and 5:19 a.m.

Then there was a more than two-hour gap in contact. O'Brien did not try to call Phillips again until 7:36 a.m., and she did not send him any more text messages until 7:39 a.m. From there, O'Brien incessantly called and sent Phillips texts throughout the rest of the morning and into early afternoon. One text at 8:34 a.m. indicates Phillips came home around that time, accused O'Brien of

---

[4] Phillips sent O'Brien two messages in this window as well. In one, at 2:26 a.m., he stated: "Naw when the old D come back hml until then I can't be with this new D I can't stand her she ain't what I want or need."

being involved, and then left.[5]  In another, at 10:24 a.m., O'Brien stated, "I aint do no bs.  I knew there was kids."  Two minutes later, she stated, "If I aint have bad luck id have nun at all."  She made a similar statement to an officer who talked to her the afternoon of the fire after learning someone had died.

### E.      Proceedings

O'Brien was charged by trial information with two counts of first-degree murder.  The case was submitted to the jury under a felony-murder theory, with first-degree arson serving as the predicate forcible felony.  *See* Iowa Code §§ 702.11(1), 707.2(1)(b), 712.2. (2018).  The jury found O'Brien guilty as charged, and she appealed following the imposition of sentence.

## II.    Standard of Review

We review challenges to the sufficiency of evidence for correction of errors at law, giving high deference to the verdict.  *State v. Burns*, 988 N.W.2d 352, 370 (Iowa 2023).  In doing so, we view "the evidence 'in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence.'" *State v. Ortiz*, 905 N.W.2d 174, 180 (Iowa 2017) (citation omitted).  We will uphold a conviction if the evidence can convince a rational jury that the defendant is guilty beyond a reasonable doubt.  *State v. Wickes*, 910 N.W.2d 554, 563 (Iowa 2018).  "Evidence is not insubstantial just because it might support a different conclusion; the only question is whether the evidence supports the finding actually made."  *State v. Maldonado*, 993 N.W.2d 379, 389 (Iowa Ct. App. 2023).

---

[5] This text said, "So u jus came home 2 accuse me of sum bs.  N leave.  U don't know dee at all then."

### III.    Analysis

For her challenge to the sufficiency of the evidence, O'Brien does not start with a specific attack on what the State failed to prove.  Instead, she complains about the big picture.  She points out that the evidence was circumstantial, suggests the State's case was riddled with gaps in the evidence, faults the State for not presenting eyewitnesses or physical evidence tying her to the crime, and tries to poke other holes in the State's theory of the case.

Turning first to O'Brien's complaint about the circumstantial nature of the evidence, the jury was properly instructed that it "should not be concerned about whether the evidence is direct or circumstantial," and "[t]he law makes no distinctions between the weight you may give to either direct or circumstantial evidence."  *Accord State v. Brimmer*, 983 N.W.2d 247, 256 (Iowa 2022) ("[C]ircumstantial evidence is as probative as direct evidence.").  True, the State's case consisted mainly of circumstantial evidence but, here, "there was a lot of it." *See State v. Miller*, No. 22-0832, 2023 WL 4759452, at *7 (Iowa Ct. App. July 26, 2023).  And the abundance of circumstantial evidence filled in the gaps in the evidence that O'Brien complains about.

To begin, O'Brien argues the State provided no evidence of "a motive to wish either Phillips or Teryn harm" because she knew Phillips had relations with other women, including one that he got pregnant, and she did not take any action against those women.  *See State v. Hoffer*, 383 N.W.2d 543, 549 (Iowa 1986) ("Although motive is not a necessary element of murder, lack of motive may be considered in determining whether an assailant acted with malice aforethought.").  The evidence, however, overwhelmingly paints a picture of a woman scorned by

Phillips's unfaithfulness with Teryn. *See State v. Newell*, 710 N.W.2d 6, 21 (Iowa 2006) ("[T]he prior relationship between the defendant and the victim, including bad feelings, quarrels, and physical acts, is a circumstance that may be shown to prove the defendant's state of mind and motivation at the time of the crime."). O'Brien damaged Teryn's home just nine days before the fire. Like the fire, this also occurred in the early morning and involved O'Brien swinging something metal at Teryn before busting out the front windows of the home. And a few weeks before that incident, Teryn testified that O'Brien tried to chase her and Phillips down in a vehicle.

Then, shortly after midnight the day of the fire, an aggressive O'Brien showed up at Teryn's house, suspecting correctly that Phillips was there. After Phillips "beat the crap out of her," O'Brien was taken home, arriving there around 2:00 a.m. But the evidence showed she didn't stay there. When Newman gave Phillips and Teryn a ride home after they got done partying around 5:00 a.m., he recalled that Teryn was carrying her shoes in her hand. And then O'Brien texted Phillips at 5:19 a.m. about "that nasty bitch" "outside walkin around barefeet." From that message, a rational juror could reasonably infer that O'Brien was back at Dawson Street just over an hour before the fire started and saw Teryn come home barefoot with Phillips. A rational juror could also find that O'Brien's text message to Phillips two minutes later wished him harm: "Karma comin 4 u. Hope u redy n I hope it hurt oms u aint the traymone I fell in luv wit." Then she went radio silent until roughly 7:30 a.m.

During that gap in messaging, the State presented evidence of O'Brien leaving the scene around the time the home became engulfed in flames and

returning to the area of her own apartment—from the gray-sweatsuit-and-stocking-cap clad figure with white shoes moving east from the crime scene to Broadway street as shown on the home-surveillance footage, to that same individual then seen wearing a camouflage undershirt and getting a yellow-lidded fountain drink at Kwik Star, to O'Brien proceeding south past the MidAmerican building wearing a camouflage shirt and white shoes while carrying a yellow-lidded fountain drink, to a person with those same characteristics walking by an interstate camera near O'Brien's apartment at 7:03 a.m.

That brings us to O'Brien's suggestions that the video and photographic evidence does not depict her. She "contends the difference in the photographs should cause a reasonable person to be cautious about concluding they are photographs . . . of one and the same person." The jury was instructed to consider the evidence based on its observations, common sense, and experience. Following that guidance, the jury could rationally conclude the photographs and videos placed O'Brien at the crime scene. *See State v. Shorter*, 893 N.W.2d 65, 74 (Iowa 2017) ("[T]he strength of the identity evidence . . . is a question for the jury."); *see also State v. Doolin*, 942 N.W.2d 500, 511 (Iowa 2020) ("Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable features."). The camouflage shirt and yellow-lidded fountain drink shown in the videos from the Kwik Star and MidAmerican building served as substantial evidence from which the jury could conclude the individuals in those two videos were the same person. And the jury was able to compare a still photo of the person who walked by the MidAmerican building with a still photo of O'Brien from an officer's body-cam the afternoon of the

fire—both showing her body, face, and hair. *Cf. State v. Martinez*, No. 17-1373, 2018 WL 3060270, at *3 (Iowa Ct. App. June 20, 2018) ("Because the only evidence placing Martinez at the scene was an identification by police officers from a surveillance video that did not show the burglars' faces or any other distinctive features, we find insufficient evidence to sustain his convictions."). While it's true that law enforcement did not recover the clothing that O'Brien shed on her way home from the scene, that does not render the evidence insubstantial. It's just more evidence that O'Brien tried to conceal her identity and cover her tracks.

Next, O'Brien submits the evidence was insufficient because she cooperated with law enforcement and turned over items of clothing to be taken for testing, none of which tested positive for gasoline or another accelerant. But, based on the evidence discussed above, O'Brien clearly lied to law enforcement when she told them that she didn't care about Phillips being with Teryn. *See State v. Cox*, 500 N.W.2d 23, 25 (Iowa 1993) ("A false story told by a defendant to explain or deny a material fact against him is by itself an indication of guilt."). And it was up to the jury to decide whether the lack of inculpatory information that resulted from the seizure of clothing overcame the strong evidence of O'Brien's motive and her being at the crime scene when it happened. *See State v. Shanahan*, 712 N.W.2d 121, 135 (Iowa 2006) ("The function of the jury is to weigh the evidence and 'place credibility where it belongs.'" (citation omitted)). Spilling gasoline or another accelerant on one's clothes or getting it on their hands is not a prerequisite to starting a fire, as O'Brien suggests.

In all, while this was mostly a circumstantial case, there was an abundance of circumstantial evidence to fill in the evidentiary gaps O'Brien complains about when viewing the evidence in the light most favorable to the State.[6]

## IV. Conclusion

We affirm O'Brien's convictions as supported by substantial evidence.

**AFFIRMED.**

---

[6] O'Brien suggests—in passing and without argument or supporting authority—that "[t]here is no showing of the requisite intent of arson in the first degree or murder in the first degree even when pursued under the felony murder rule." We find she waived this bare-bones argument. *See* Iowa R. App. P. 6.903(2)(g)(3); *State v. Louwrens*, 792 N.W.2d 649, 650 n.1 (Iowa 2010) ("[P]assing reference to an issue, unsupported by authority or argument, is insufficient to raise the issue on appeal.").