# IN THE COURT OF APPEALS OF IOWA

No. 23-0395
Filed August 21, 2024

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**DOUGLAS RAYMOND SPURGEON,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Wapello County, Crystal S. Cronk,

Judge.


        The defendant appeals following his convictions for second-degree murder,

assault while participating in a felony causing serious injury, and going armed with

intent.  **AFFIRMED.**


        Christine E. Branstad of Branstad & Olson Law Office, Des Moines, for

appellant.

        Brenna Bird, Attorney General, and Joseph D. Ferrentino, Assistant

Attorney General, for appellee.


        Considered by Schumacher, P.J., Buller, J., and Potterfield, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2024).

**POTTERFIELD, Senior Judge.**

Douglas Spurgeon appeals following his convictions for second-degree murder (count I), assault while participating in a felony causing serious injury (count II), and going armed with intent (count III). Spurgeon contends (1) the greater weight of credible evidence supports a finding someone else's actions caused the death of Gerald Sapp, so his motion for new trial should have been granted; (2) it was legally inconsistent for the jury to acquit him of first-degree murder but find him guilty of assault while participating in a felony causing serious injury and going armed with intent; and (3) counts II and III should merge with count I.

**I. Background Facts and Proceedings.**

The State charged Spurgeon by trial information with first-degree murder, assault while participating in a felony causing serious injury, and going armed with intent, alleging Spurgeon was responsible for the stabbing death of Sapp on November 11, 2021. Spurgeon pled not guilty.

The following evidence was introduced at Spurgeon's five-day jury trial, which took place in January 2023. On the afternoon of November 11, Sapp was working on a vehicle outside Pat Parker's garage—near the alley that separated Parker's home and Spurgeon's mother's home. Arthur Dyke was also there. After walking around the corner to speak with his wife, Dyke was walking back toward Parker's garage when he saw Spurgeon walking in the alley. When Spurgeon got to where Sapp was, Spurgeon hit Sapp in the chest. Sapp tried to get away from Spurgeon, and he made it some distance before turning to look at Dyke and Parker, stating, "Now, come on, Pat." According to Dyke, it was about that time

that he saw Spurgeon's knife go into Sapp's neck. While Dyke previously thought he was witnessing a fist fight, it was then he realized that Spurgeon was repeatedly stabbing Sapp, who was unarmed. When he stopped stabbing Sapp, Spurgeon first started walking toward Parker and Dyke before ultimately running into his mother's home, where Spurgeon was living. Dyke noted that Sapp's blood was on Spurgeon when he fled; after Spurgeon pulled the knife out of Sapp's neck "blood [spray] just kind of went everywhere." According to Dyke, Parker called 911.

Parker died sometime before Spurgeon's trial. His 911 call was admitted and played for the jury. In it, Parker identified himself to the dispatcher before reporting he witnessed a stabbing. He named Spurgeon as the perpetrator and Sapp as the victim, stating, "A guy just came over and stabbed him . . . about four times in the goddamn neck" and later stating that Spurgeon "stabbed [Sapp] in the fucking throat about six times." When asked if the perpetrator was still at the scene, Parker reported that Spurgeon was "over across the alley, he went to his mom's house" and that he left with the knife he used in hand.[1]

According to Sergeant Steven Kovacs, he was dispatched to the scene at approximately 2:40 p.m. and arrived just a few minutes later. Sergeant Kovacs spoke with Parker when he arrived and noted that Parker did not have any blood on him. Within a minute, he approached Sapp, who was "lying face down" on the ground "in a pool of blood." It was immediately apparent Sapp was already deceased, and there were obvious stab wounds to his body.

---

[1] There is not a transcript of the 911 call; the quoted language is our best attempt at accurately transcribing Parker's statements from the audio recording.

Law enforcement surrounded Spurgeon's home for hours until a warrant was procured. After gaining entry into the house at approximately 7:00 p.m., law enforcement conducted a first sweep without finding Spurgeon. During the second, more intensive search, they found him in a long, narrow closet that had boxes and items blocking the doorway—presumably stacked by Spurgeon after he entered. Spurgeon was wearing only boxers and socks when he was removed from the closet. During the same search, officers seized clothing from Spurgeon's bedroom floor, a tool belt with tools that was attached to the clothing, Spurgeon's cell phone, and a pocketknife found in Spurgeon's room (among other things).

Although he did not have any external wounds requiring medical attention, Spurgeon was taken to the local hospital. Photographs taken of his body show that, as of the night of November 11, Spurgeon had a few minor scrapes and cuts but no other injuries. Photographs taken of Spurgeon approximately three days later in the jail show a bruise on his left thigh.

Associate Medical Examiner Dr. Michele Catellier performed the autopsy on Sapp and testified at Spurgeon's trial. She identified twelve stab wounds and "some smaller scratch-type wounds in several locations." Of the twelve stab wounds, she identified three that "interrupted vital structures." One of those stab wounds went into the front of Sapp's neck through his right carotid artery. Another—which was nearly six inches deep—went through Sapp's ribs, right lung, pericardium, and into the superior vena cava. And the final of the three wounds went through Sapp's rib cage and into his liver. Dr. Catellier also identified a stab wound to Sapp's scalp—one of the nine "other" wounds—from which a knife

fragment was recovered.[2]  When asked, Dr. Catellier could not say whether all twelve stab wounds were caused by a single weapon or if multiple instruments were used.  She opined that it would not be unreasonable to expect a person with Sapp's constellation of injuries to die of those injuries within minutes or even sooner.

The Iowa Division of Criminal Investigation (DCI) later performed DNA testing on the items seized from Spurgeon's home.  Blood was found on a flat head screwdriver from Spurgeon's tool belt, the denim pants he admitted he was wearing on November 11,[3] and Spurgeon's phone, with the DNA profile of each blood spot matching the known profile of Sapp.  Blood was not found on the pocketknife that Spurgeon later testified he used when he stabbed Sapp.

According to Spurgeon, who testified in his own defense, he was smoking a cigarette in the backyard when he heard someone walking near his mother's privacy fence and decided to go investigate.  Soon after Spurgeon exited the fenced-in area, Sapp came around the corner holding a wrench, which he swung at Spurgeon, hitting him in the left thigh.  As he came at him, Sapp said to Spurgeon, "I want to put a wig on you."  Spurgeon and Sapp had met previously but were largely unknown to each other, and Spurgeon could not explain why Sapp came at him or the reason for his statement.  Spurgeon claimed he tried to get away, as Sapp continued to swing the wrench at him.  At some point, Spurgeon

---

[2] The knife with the missing fragment was never recovered.  A knife with a missing fragment was found in and seized from Spurgeon's home, but later testing showed the fragment did not come from that knife.

[3] Specifically, Tara Scott, a criminalist for the DCI, testified that she located nine blood stains on the pants.  She tested two of the nine spots, and both matched Sapp's DNA.

took out his pocketknife and "hit" Sapp with it. Sapp fell to the ground but grabbed ahold of Spurgeon's leg and would not let go. Still trying to get away, Spurgeon "hit[] [Sapp] twice in the shoulder area" with the knife. At this point, Sapp let go of Spurgeon's leg, and Spurgeon sprinted back into his mother's home. Spurgeon conceded he "stabbed [Sapp] once in his chest area or shoulder, and then . . . made contact with [Sapp] twice when [he] was trying to get away from [Sapp's] grasp" but claimed he only did it to prevent Sapp from harming him. He denied responsibility for any other stab wounds—which included all the wounds the medical examiner identified as interrupting vital structures. After running home, he washed his hands and knife, stripped down to his boxers, and ultimately ended up hiding in the narrow closet because he thought it seemed safe. Spurgeon denied knowing the police were in the home or searching for him until the closet door opened and an officer ordered him out.

The jury found Spurgeon guilty of the lesser-included offense second-degree murder (count I), assault while participating in a felony causing serious injury (count II), and going armed with intent (count III). After denying each of Spurgeon's post-trial motions, the district court sentenced Spurgeon to a fifty-year term, ten-year term, and five-year term of incarceration, respectively, and ordered Spurgeon to serve the three sentences concurrently.

Spurgeon appeals.

## II. Discussion.

### A. Weight of the Evidence.

Spurgeon contends the district court should have granted his motion for new trial because the jury's verdicts are contrary to the greater weight of the credible

evidence. *See* Iowa R. Crim. P. 2.24(2)(b)(6) (2023). When a defendant moves for new trial based on the weight of the evidence, the "test is more searching than the sufficiency-of-the-evidence test, involves questions of credibility, and requires the district court to determine whether more credible evidence supports one side or the other." *State v. Shorter*, 893 N.W.2d 65, 70 (Iowa 2017). We review for an abuse of discretion. *Id.* at 71.

Spurgeon moved for new trial, arguing to the district court that the State's version of events was not reasonable because no one presented any evidence to establish he had a motive to stab Sapp twelve times "out of the blue" and that it was more likely Parker who inflicted the additional, fatal stabs. He also questioned why, if he was the killer, the police never found the knife that broke off in Sapp's scalp—since it was undisputed that Spurgeon ran directly from the scene to his mother's house, where he remained until police officers took him into custody.

In its written order, the district court denied Spurgeon's motion, ruling:

> [Spurgeon's] motion for new trial asserts the record in this case does not support a finding of guilty beyond a reasonable doubt with multiple specific arguments. At trial, evidence was presented from Pat Parker and Arthur Dyke that identified [Spurgeon] as being Gerald Sapp's assailant. [Spurgeon] himself testified that he exited his property with his knife in his possession, which he used . . . against Sapp, though he asserts he only stabbed Sapp a few times and that someone else was responsible for the fatal injuries. No evidence of another assailant was presented. Both Parker and Dyke were briefly interviewed and observed by law enforcement after the 911 call was made. No officer testified seeing anything that would lead them to suspect that either Parker or Dyke were involved in the attack. The evidence presented indicated that the only physical altercation that occurred was between Sapp and [Spurgeon] and there was no physical evidence that suggested that Parker, or anyone else, had any involvement in Sapp's death. While there was an absence of evidence regarding motive and no murder weapon was recovered, the uncontroverted evidence shows [Spurgeon] was left alone for a significant time after the murder and

his behavior was irregular and unusual prompting medical attention. In weighing the credible evidence, the court finds the verdict is not contrary to the weight of the evidence and a new trial is not warranted.

Here on appeal, Spurgeon focuses on his lack of motive to kill or seriously injure Sapp and questions the State's evidence he intended to do so. In conducting our review, we keep in mind that our role "is not to determine whether the verdict is contrary to the weight of the evidence but only to determine whether the district court abused its considerable discretion in denying the motion." *State v. Stendrup*, 983 N.W.2d 231, 246 (Iowa 2022). And in reaching its decision on the motion for new trial, the district court, who sat through the trial, relies on its credibility determinations. *See State v. Ary*, 877 N.W.2d 686, 706 (Iowa 2016) (recognizing that the weight-of-the-evidence standard permits the district court to consider the credibility of witnesses). In this instance, the district court implicitly concluded that Spurgeon's testimony he was responsible for only a few of Sapp's stab wounds (and none of the fatal ones) is not credible. And while no motive was ever established, "motive for a killing is not a necessary element of murder in the second degree." *State v. Smith*, 242 N.W.2d 320, 326 (Iowa 1976).

Here, where there were two eyewitnesses who named Spurgeon as the perpetrator of the fatal stabbing in the immediate aftermath of the act, and where there was no physical evidence tying either of those eyewitnesses to the stabbing, the district court did not abuse its discretion in concluding the greater weight of the credible evidence supported the jury's verdicts. *See Ary*, 877 N.W.2d at 706 ("[A] district court may invoke its power to grant a new trial on the ground the verdict was contrary to the weight of the evidence only in the extraordinary case in which

the evidence preponderates heavily against the verdict rendered."). We affirm the denial of Spurgeon's motion for new trial.

### B. Allegedly Inconsistent Verdicts.

Spurgeon contends that the jury returned legally inconsistent verdicts. The State responds, challenging both error preservation and the merits of Spurgeon's claim.

We start with the question of whether Spurgeon properly preserved error. The State maintains that Spurgeon failed to preserve error because he never raised the issue to or got a ruling on it from the district court. Spurgeon responds that he was not required to raise the issue in a post-trial motion to preserve error and that we may decide the claim on the record we have. A panel of our court recently addressed error preservation in this context at length:

> In [*State v.*] *Halstead*, the State conceded error was preserved on a compound-inconsistent-verdicts claim presented by motion for new trial. 791 N.W.2d [805, 807 n.1 (Iowa 2010)]. Since then, our appellate courts have avoided decisively resolving how error should be preserved on inconsistent-verdicts claims when the State contests the issue. *See, e.g.*, *State v. Thiel*, No. 22-1293, 2024 WL 111774, at *8 (Iowa Ct. App. Jan. 10, 2024) (describing this "murky issue" and noting "we've avoided deciding" it); *State v. LuCore*, 989 N.W.2d 209, 219 (Iowa Ct. App. 2023) ("Sidestepping the serious error-preservation concern . . . "); [*State v.*] *Sassman*, [No. 21-0434] 2022 WL 4361785, at *2 [Iowa Ct. App. Sept. 21, 2022] ("[W]e opt to bypass the error-preservation issue."); *State v. Doorenbos*, No. 19-1257, 2020 WL 3264408, at *3 (Iowa Ct. App. June 17, 2020) (noting the concession in *Halstead* and "opting to reach the merits"); *State v. Scholtes*, No. 16-1967, 2017 WL 3525296, at *1 (Iowa Ct. App. Aug. 16, 2017) (recognizing the error-preservation issue and citing a civil case to address the merits notwithstanding). . . .
> The core of the State's argument is that we should require error preservation when corrective action may still be taken. *See* [*State v.*] *Krogmann*, 804 N.W.2d [518, 524 (Iowa 2011)] ("[O]ur regular error preservation rules also require parties to alert the district court 'to an issue at a time when corrective action can be taken.'" (citation omitted)). The rules of criminal procedure, which authorize

the district court to "direct the jury to reconsider" an inconsistent verdict lend support to this view. Iowa R. Crim P. 2.22(6). The State highlights this need for timely corrective action is "doubly important" in criminal cases after *Halstead*, where our supreme court held that inconsistent split verdicts required acquittal on both charges without possibility of retrial given double jeopardy. 791 N.W.2d at 816–17. To conclude otherwise, the State urges, motivates defendants to gamble on their own convictions—avoiding the possibility a jury reconsiders its verdicts and convicts on a greater charge while keeping an ace up the defendant's sleeve in the form of appellate review after jeopardy has attached and retrial on the greater charge may be thwarted.

. . . .

. . . We hold that, to pursue an inconsistent-verdicts claim on appeal, a criminal defendant must timely raise the objection before the district court discharges the jury, such that the jury is able to reconsider the verdict as contemplated by Iowa Rule of Criminal Procedure 2.22(6) or the trial court may grant a new trial before jeopardy precludes it. *See State v. Mumford*, 338 N.W.2d 366, 371 (Iowa 1983) (approving of these two options).

*State v. Totaye*, No. 22-1169, 2024 WL 3518074, at *9–10 (Iowa Ct. App. July 24, 2024) (footnote omitted).

Going forward, we require defendants to preserve error on their inconsistent-verdict claims. *See id.* at *10. But like the panel in *Totaye* observed, we recognize that applying the error-preservation rule to Spurgeon would be a surprise based on our previous rulings in our unpublished cases. *Id.* So, we proceed to the merits of Spurgeon's claim.

In determining whether the jury's verdicts are inconsistent, "the test to be applied is whether the verdict is so logically and legally inconsistent as to be irreconcilable within the context of the case." *State v. Montgomery*, 966 N.W.2d 641, 651 (Iowa 2021) (citation omitted).[4]

---

[4] The standard of review is in dispute. *Compare Halstead*, 791 N.W.2d at 807 (rejecting the parties' framing of review as for "substantial evidence" and instead reviewing a "question of law" with the caveat "[t]o the extent constitutional issues

Here, Spurgeon maintains that the jury's decision to acquit him of first-degree murder means it found he did not act "willfully, deliberately, premeditatedly and with specific intent to kill" Sapp,[5] which he claims is legally inconsistent with finding him guilty of assault while participating in a felony causing serious injury and going armed with intent. More specifically, Spurgeon claims that it is legally inconsistent to conclude he did not act "willfully, deliberately, premeditatedly and with a specific intent to kill Sapp" (as needed for first-degree but not second-degree murder) but did have "the specific intent to use the knife against another person" (as needed for going armed with intent and, accordingly, assault while participating in a felony causing serious injury).[6] But it is neither legally nor logically inconsistent

---

are raised, review is de novo"), *with State v. Merrett*, 842 N.W.2d 266, 272–73 (Iowa 2014) ("The consequence of a potentially inconsistent jury verdict is a question of law, and accordingly, our review is de novo."). *But see Sassman*, 2022 WL 4361785, at *3 (referring to a "hybrid standard of review" for inconsistent-verdicts claims that combines the two). As in *Totaye*, "[w]e need not resolve the dispute in this case, as we would come to the same conclusion in reviewing this legal question under either standard . . . ." 2024 WL 3518074, at *9.

[5] The jury was instructed that to find Spurgeon guilty of first-degree murder, it had to find:

     1. On or about the 11th day of November, 2021, [Spurgeon] stabbed or cut [Sapp].
     2. [Sapp] died as a result of being stabbed or cut.
     3. [Spurgeon] acted with malice aforethought.
     4. [Spurgeon] acted willfully, deliberately, premeditatedly and with a specific intent to kill [Sapp].
     5. [Spurgeon] acted without justification.

In contrast, to find Spurgeon guilty of second-degree murder, it was only required to find:

     1. On or about the 11th day of November, 2021, [Spurgeon] stabbed or cut [Sapp].
     2. [Sapp] died as a result of being stabbed or cut.
     3. [Spurgeon] acted with malice aforethought.
     4. [Spurgeon] acted without justification.

[6] The crimes in counts II and III were linked, as the jury had to find Spurgeon participated in the crime of going armed with intent to find him guilty of assault while participating in a felony causing serious injury.

for the jury to conclude that Spurgeon did not plan to kill Sapp but that he did intend to use the knife against Sapp. And this determination fits with the finding of guilt for second-degree murder, which includes the element of "malice aforethought" or "a fixed purpose or design to do some physical harm to another which must exist prior to the act being committed and continued during the act." *State v. Reeves*, 670 N.W.2d 199, 206 (Iowa 2003). Spurgeon's claim of inconsistent verdicts fails on the merits.

**C. Merger.**

For his final claim, Spurgeon asserts that count II and count III should have merged with count I. While "'[t]he Double Jeopardy Clause prohibits multiple punishments for the same offense,'" "[t]he legislature defines the offenses and can provide for multiple punishments for separate offenses that apply to the same conduct." *State v. Johnson*, 950 N.W.2d 21, 24 (Iowa 2020) (quoting *State v. Halliburton*, 539 N.W.2d 339, 344 (Iowa 1995)). "[M]erger only applies when there is complete overlap between two offenses." *State v. Bloom*, 983 N.W.2d 44, 51

---

Regarding the charge of going armed with intent, the jury was instructed it must find the following to find Spurgeon guilty:

1. On or about the 11th day of November, 2021, [Spurgeon] was armed with a knife.
2. The knife was a dangerous weapon . . . .
3. [Spurgeon] was armed with the specific intent to use the knife against another person.
4. While armed with the knife, [Spurgeon] moved from one place to another.

And to find Spurgeon guilty of assault while participating in a felony causing serious injury, the jury had to find:

1. On or about the 11th day of November, 2021, [Spurgeon] committed an assault on [Sapp] . . . .
2. At the time of the assault, [Spurgeon] was participating in the crime of Going Armed with Intent . . . .
3. The assault caused a serious injury.

(Iowa 2022). To determine whether two offenses should merge, we apply a two-step analysis. *Johnson*, 950 N.W.2d at 24. First, we compare "the elements of the two offenses to determine whether it is possible to commit the greater offense without also committing the lesser offense." *Id.* (citation omitted). Regardless of the result in step one, we proceed to the second step, "examining '[w]hether the legislature intended multiple punishments for both offenses.'" *Bloom*, 983 N.W.2d at 51 (alteration in original) (citation omitted); *accord id.* (continuing to the second step even when the crimes have separate, unique elements).

We start by considering whether Spurgeon could commit second-degree murder without also committing going armed with intent. Because he could commit the crime of second-degree murder without "mov[ing] from one place to another," which is an element of going armed with intent, the crimes do not merge. *See id.* (recognizing two convictions do not merge when one conviction "requires proof of an additional fact which [the other] does not" (citation omitted)). And, for the same reason, assault while participating in a felony causing serious injury also does not merge with second-degree murder—because the assault conviction hinges on the jury finding Spurgeon participated in the crime of going armed with intent, which includes the additional element of "mov[ing] from one place to another." *See State v. Brown*, 996 N.W.2d 691, 698 (Iowa 2023) (reiterating that "we look to the elements of the offense, not to the particular facts of a case" when determining whether a crime is a lesser-included offense).

Still, we consider whether the legislature intended multiple punishments for both offenses. *See id.* at 699 ("While the legal-elements test indicates the two crimes do not merge, we must also determine 'whether the legislature intended

multiple punishments for both offenses.'" (citation omitted)). Yet "[i]f one offense is not an included offense within the other, 'there is the presumption that multiple punishments can be assessed.'" *State v. Ceretti*, 871 N.W.2d 88, 92 (Iowa 2015) (citation omitted). Here, because we are convinced the legislature intended to protect against different harms with the three separate crimes, we conclude that neither count II nor count III merges with second-degree murder. *See Johnson*, 950 N.W.2d at 26 ("We have declined to merge offenses when the underlying statutes focus on 'different dangers.'" (citation omitted)); *see also State v. Perez*, 563 N.W.2d 625, 628–29 (Iowa 1997) (concluding the legislature's creation of crime while participating in a public offense causing serious injury showed its intent to punish for both crimes).

## III. Conclusion.

Because the district court did not abuse its discretion in denying Spurgeon's motion for new trial based on the weight of the evidence, Spurgeon's claim that the jury rendered inconsistent verdicts is without merit, and counts II and III do not merge with Spurgeon's conviction for second-degree murder, we affirm.

**AFFIRMED.**